

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0195-13

**ROBERT RUBALCADO, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE ELEVENTH COURT OF APPEALS
### ECTOR COUNTY

KELLER, P.J., delivered the opinion of the Court in which PRICE, WOMACK, KEASLER, HERVEY, COCHRAN and ALCALA, JJ., joined. JOHNSON, J., concurred. MEYERS, J., did not participate.

Appellant, arrested pursuant to an Ector County complaint, made bail and was released from incarceration. Afterwards, at the behest of Midland County law enforcement, the complaining witness in the Ector County case contacted appellant and elicited incriminating statements from him. The question before us is whether appellant's Sixth Amendment right to counsel was violated when these statements were later used as primary evidence of guilt in the Ector County case. We conclude that appellant's right to counsel was violated with respect to the Ector County prosecution, and we reverse the judgment of the court of appeals.

## I. BACKGROUND

### A. Facts

In 2002, appellant began a romantic relationship with J.S.'s mother and moved into her home in Midland, in Midland County. In 2004, the family moved to Odessa, in Ector County. J.S. subsequently accused appellant of sexually abusing her, and on March 12, 2009,[1] a complaint was filed in Ector County that accused appellant of aggravated sexual assault of a child.[2] The next day, appellant was arrested pursuant to a warrant,[3] and soon thereafter he was released on bail. A criminal investigation also began in Midland County, and Midland police officers subsequently asked J.S. to make pretextual phone calls to appellant in an effort to induce appellant to confess to committing crimes against J.S.[4]

---

[1] J.S. was seventeen years old at the time the complaint was filed and almost nineteen years old when she testified at trial.

[2] The complaint stated that appellant did "intentionally and knowingly cause the penetration of the vagina of J.S. with his penis without the effective consent of J.S. a child younger than 17 years of age."

[3] The probable-cause affidavit for the warrant recited that the abuse began with appellant touching J.S.'s "privates" and that this conduct eventually progressed to appellant having sex with J.S.

[4] The following was elicited from J.S. during voir dire questioning by defense counsel:

Q. The police officer asked you to call Robert?

A. They asked me if I would like to. They didn't tell me I had to.

Q. Okay. But they asked you to call him; right?

A. Yes.

Q. And you acted on that question. You did call him; correct?

J.S. agreed to make the phone calls. The Midland police department supplied recording equipment that J.S. could connect to her cell phone and operate. J.S. connected the equipment herself and called appellant on three different days: September 10th, 23rd, and 29th of 2009. At least one Midland police officer was with J.S. during each call, but the police did not tell J.S. what to say.

In all three phone calls, J.S. and appellant engaged in innocuous banter about how they were doing and about their activities. Often, J.S. would just respond "yeah," "right," or "okay" to comments made by appellant, but there were some occasions in which J.S. made comments that were designed, or possibly designed, to elicit incriminating responses.

In the first phone call, J.S. said, "I miss you," and appellant responded, "I miss you too,

---

A. Yes.

\* \* \*

Q. But you did call – you do admit that you called him at their request?

A. Yes.

Q. And the purpose of that call was to get some sort of confession?

A. Yes.

\* \* \*

Q. And you made the call again at their request?

A. Yes.

Q. Okay. And the purpose of the call was to seek a confession?

A. Yes.

baby." J.S. followed with "I miss being with you," and appellant responded, "I know. I miss you being here too." Later in the conversation, J.S. stated, "I want to go home already." Appellant responded, "Hmm?" J.S. repeated her statement, and appellant replied, "I know, baby. My phone battery is low. You can call me back later on or tomorrow, okay?"

In the second phone call, J.S. again said, "I miss you." Appellant responded that he missed her too, and he talked about God and asked J.S. to keep appellant in her prayers. J.S. responded, "I really want to come home already." Appellant responded that he would love to be around her, especially when she graduates, that he missed her, and that he would help her any way he could. J.S. asked, "Do you think I will be able to come home?" Appellant responded that a few steps would have to be taken. J.S. replied, "What have I got to do?" Appellant told her that she needed to talk to his lawyer. J.S. then asked, "What am I having to do when I get there?" Appellant asked, "Is anybody around you?" J.S. responded negatively, and appellant launched into a long discussion that included topics such as the need for J.S. to talk to his lawyer, various topics relating to God, and that appellant and J.S. would work things out. This discussion included statements by appellant that, "That thing that happened, nothing happened, I was mad," "I will try my best, my very best to make a house for you," and "I want to make you your own room. I am going to fix it the way it should be fixed for a girl. And I guarantee you, I will break my back for you to get what you want and need." Appellant also said that he missed her, loved her, wanted her to be around, and wanted to take care of her like a father would. Near the end of this discussion, appellant also mentioned J.S. "dropping the charges" so that she could come home.

In the third phone call, after appellant had said he was "changing" and God was working on him, J.S. said, "Also, you want me to talk to a lawyer." Appellant responded that he wanted her to

if she were comfortable with it, "not because anybody is forcing you." At some point, J.S. asked, "So if I go back home, it will be different?" Appellant responded affirmatively and asked her to tell him how different she would like it to be. After some further explanations from appellant, J.S. repeated, "So things are going to be different if I go home?" Appellant responded, "Yes."

After some more discussion from appellant, J.S. asked, "Can I ask you a question?" Appellant responded, "Sure." J.S. then asked, "Can I ask why you were doing those things to me?" Appellant responded, "Do what? What things?" J.S. replied, "The way you were touching me and stuff like that." Appellant responded that appellant, J.S., and J.S.'s mother would have to get together and "see what is going on." Then J.S. reiterated, "And if I go back home, everything is going to be different?" Appellant responded that things would be different and that "we" had "realized what our bad attitudes are" and that everyone—including appellant and J.S.'s mother and brothers—needed to change. Then J.S. asked, "Can I ask you something else?" Appellant responded affirmatively, and J.S. asked, "Why did you have sex with me?" Appellant responded evasively: "We will get with your mom and see [inaudible] because I already got this thing over. If you don't want to do it - - I mean, if you want to come, I mean." J.S. replied, "I do, but I want everything to be different." Appellant responded, "It is going to be different."

The discussion continued along that vein until J.S. said, "So what do I have to do to go talk to a lawyer?" Appellant responded that she would have to talk to the district attorney and could try to drop the charges, but appellant said that the district attorney might not drop the charges even if J.S. wanted to. Appellant suggested that J.S. could tell the district attorney why she wanted to drop the charges, but he said that he was not telling her what to do or say and that she should not do it if she did not feel comfortable doing so.

Further in the conversation, J.S. asked, "So it is going to be different, you have changed and everything?" Appellant responded, "Yes." J.S. then asked, "So then you won't be doing anything any more." Appellant responded, "I am not going to do nothing but pray to God, like I done when I was younger and everything." Appellant then talked further about his relationship with God. At some point, J.S. interjected, "I just wanted to make sure everything was going to be different, that you change and won't be touching or sex with me or anything like that." Appellant responded, "We all change. We all change. And we still have work to do, we still have God working on us, we still have to pray for each other."

J.S. then engaged in the following colloquy in an attempt to elicit appellant's agreement with her allegations:

J.S.: Do you agree with me?"

APPELLANT: Agree with you?

J.S.: I said, do you agree with that, what I said?

APPELLANT: About what?

J.S.: Do you agree that we have to change, that you can't - -

APPELLANT: Oh, yes.

J.S.: - - have sex or no more touching?

APPELLANT: Change. You are supposed to change. I mean, we all have to change. I mean, your mom has to change. Your mom has changed a whole lot, believe me. I feel it. [One of your brothers] has changed a little bit. You know, he still [inaudible], stuff like that.

Appellant then launched into a long discussion about God, talking to a lawyer, and people's hearts. This discussion included the statement, "And I can tell you from my part that I am sure on my

brother's heart, you have nothing to be afraid of."

On November 16, 2009, appellant was indicted in Ector County for various sex offenses against a child.[5] During J.S.'s testimony in its case-in-chief, the State offered the three recorded phone conversations.[6] Defense counsel objected that the recordings violated the right to counsel. Defense counsel stated that "the officer"[7] was informed in February of 2009 that appellant had an attorney. Defense counsel also stated that, at the time of the recordings, appellant had been charged by complaint and had made bail. Defense counsel also contended that J.S. acted as an agent of law enforcement when she made the calls and law enforcement "couldn't do it so she can't do it for them." The prosecutor responded that the phone calls were orchestrated by the Midland Police Department, not the Odessa Police Department, and that the Midland Police Department was "not aware of counsel at that time."[8] The trial judge overruled appellant's objection, and the recordings

---

[5] Appellant was indicted for various forms of indecency with a child by contact, sexual assault, and aggravated sexual assault. *See* TEX. PENAL CODE §§ 21.11(a)(1), (c), 22.011(a)(2), 22.021(a)(1)(B), (2)(B) (West 2014).

[6] The court of appeals's opinion erroneously states that the recordings were introduced during the testimony of Midland Police Detective Kay Therwanger. *See Rubalcado v. State*, 2013 Tex. App. LEXIS 916, *10-11 (Tex. App.–Eastland January 31, 2013, pet. granted) (not designated for publication).

[7] At the time this statement was made, the record was unclear about which officer defense counsel was talking about. Later testimony indicates that defense counsel was referring to Detective Shelly Stanford of the Odessa Police Department.

[8] The court of appeals's opinion includes additional facts derived from Detective Therwanger's testimony. *See id.* at *27-28. This included her testimony that she knew that there was an Odessa case but did not know whether appellant had an attorney. *Id.* at *28. We also observe that Detective Therwanger testified that she and J.S. talked about what J.S. might say and wrote some things down—just to prepare her. Detective Therwanger said that she told J.S. that appellant might be suspicious, so J.S. needed to get appellant comfortable and slowly lead into what happened between them. We note that Detective Therwanger had not yet testified at the time the trial court made its ruling on the admissibility of the recorded phone conversations. When the

were played to the jury.

## B. Court of Appeals

Appellant urged his right-to-counsel claim on appeal. He argued that, notwithstanding her denial at trial, Detective Therwanger must have known that appellant had an attorney at the time of the recordings. The detective must have known, appellant reasoned, because she was aware of the pending Ector County case and, given her thirty years of law-enforcement experience, she should have realized that he had an attorney in that case, even if she did not know who the attorney was. Given the circumstances, appellant argued, the detective must have also known that appellant was on bond and therefore had a lawyer. Appellant also pointed out that he referred to his attorney in the second recording, so Detective Therwanger must have known that he had an attorney by the time of the third recording. In further support of his contention that Detective Therwanger must have known that he had an attorney, appellant noted that Midland and Ector Counties are contiguous jurisdictions and that the criminal investigations in those counties involved the same alleged victim and perpetrator.

In the alternative, appellant argued that the Odessa Police Department's actual knowledge that he had an attorney should be imputed to the Midland Police Department. In support of this contention, he cited *Herron v. State*.[9] Appellant further argued that J.S. was an agent of both the

---

question is whether evidence was improperly admitted, an appellate court may consider only evidence that was before the trial court at the time of its ruling unless the issue was consensually relitigated at a later point in time. *Black v. State*, 362 S.W.3d 626, 631 (Tex. Crim. App. 2012); *Rangel v. State*, 250 S.W.3d 96, 98 (Tex. Crim. App. 2008). However, we need not address whether consensual relitigation occurred during Detective Therwanger's testimony because her testimony would not affect our holding in this case.

[9] 86 S.W.3d 621 (Tex. Crim. App. 2002).

Odessa and Midland police departments and that the recorded phone calls made by her were in violation of his right to counsel.

The court of appeals rejected appellant's right-to-counsel claim.[10] The court first rejected appellant's alternative argument that it should impute the knowledge of law enforcement in Ector County to law enforcement in Midland County.[11] The court of appeals observed that *Herron* was a Fifth Amendment right-to-counsel case, that the Supreme Court's decision in *Michigan v. Jackson*[12] is what had extended the *Edwards*[13] initiation rule from the Fifth Amendment context to the Sixth Amendment context, and that *Michigan v. Jackson* had subsequently been overruled.[14] The court concluded that the broad rule of imputation found in the Fifth Amendment context did not apply outside the context of custodial interrogation because the danger of police badgering would not be present.[15]

The court of appeals also concluded that the rule advocated by appellant would unduly burden law enforcement because it "would mean that separate law enforcement entities would have to incur the burden of continuously checking with every other law-enforcement entity in every investigation to see if a suspect has been arrested in another jurisdiction and, if so, on what charges,

---

[10] *Rubalcado*, 2013 Tex. App. LEXIS 916 at *25-36.

[11] *Id.* at *29-36.

[12] 475 U.S. 625 (1986).

[13] *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

[14] *Rubalcado*, 2013 Tex. App. LEXIS 916 at *29-35.

[15] *Id.* at *35.

and then ascertain whether he or she is represented by an attorney."[16]  Finally, the court concluded

that there was no evidence that the two police departments were coordinating their investigations.[17]

### C. Discretionary Review

Appellant contends that the present case is governed by *Massiah v. United States*.[18]  He

further argues that the knowledge of law enforcement in Ector County should be imputed to law

enforcement in Midland County.  And he contends that this case is governed by *Thompson v. State*,[19]

because the present case is an Ector County prosecution, to which his right to counsel had attached,

not a Midland County prosecution.

The State contends that the phone calls were part of a Midland County investigation,

unrelated to the Odessa charges, and therefore the right to counsel had not attached.  The State

further contends that *Massiah* is distinguishable because Massiah had been indicted at the time of

the incriminating statements while appellant had not been indicted in either Ector County or Midland

County at the time of the phone conversations.  And the State contends that "the federal agencies that

initially investigated and charged Massiah and the ones that eavesdropped on his later incriminating

statements were one and the same" while the entity that charged appellant (Odessa law enforcement)

differs from the entity that eavesdropped on him (Midland law enforcement).  The State also

contends that appellant's position invites the courts to "open a Pandora's box of claims from

defendants charged with similar crimes in different jurisdictions."

---

[16]  *Id.*

[17]  *Id.* at *36.

[18]  377 U.S. 201 (1964).

[19]  93 S.W.3d 16 (Tex. Crim. App. 2001).

## II. ANALYSIS

### A. *Massiah*

In *Massiah v. United States*, a co-defendant agreed to cooperate with the police in obtaining information from Massiah after Massiah had been released on bail.[20] Massiah was unaware of this cooperation.[21] The police installed a radio transmitter under the front seat of the co-defendant's car and secretly listened while the co-defendant elicited incriminating statements from Massiah.[22] The Supreme Court held that Massiah was denied the basic protections of his Sixth Amendment right to counsel "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."[23] That the interrogation was "indirect and surreptitious," instead of being conducted at the jailhouse, did not preclude the application of the Sixth Amendment.[24] In fact, Massiah was more seriously imposed upon . . . because he did not even know that he was under interrogation by a government agent."[25]

*Maine v. Moulton*[26] involved similar facts. Moulton and his co-defendant were on bail, the co-defendant was secretly cooperating with the government, law-enforcement personnel secretly

---

[20] 377 U.S. at 202.

[21] *Id.*

[22] *Id.* at 202-03.

[23] *Id.* at 206.

[24] *Id.*

[25] *Id.* (quoting *United States v. Massiah*, 307 F.2d 62, 72 (2ᵈ Cir. 1962) (Hays, J., dissenting)) (ellipsis in Supreme Court's opinion).

[26] 474 U.S. 159 (1985)

recorded telephone conversations and an in-person meeting between the two, and the co-defendant deliberately elicited incriminating statements from Moulton.[27] The State argued that *Massiah* was distinguishable because government agents set up the encounter in that case while Moulton initiated the telephone calls and requested the in-person meeting.[28] The Court rejected that argument, holding that the identity of the party who instigated the meeting at which the incriminating statements were obtained was not decisive or even important to its decision in *Massiah*.[29] The Court observed that the Sixth Amendment guarantees the accused, after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State.[30] The State has an affirmative obligation not to act in a manner that circumvents this protection, and the knowing exploitation of an opportunity to confront the accused without counsel is as much a breach of this obligation as the intentional creation of the opportunity.[31] "Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent."[32]

In an amicus brief, the Solicitor General contended that Moulton's case was distinguishable from *Massiah* because the Maine police had other, legitimate reasons for listening to Moulton's

---

[27] *Id.* at 163-66.

[28] *Id.* at 174. The State was also attempting to distinguish *United States v. Henry*, 447 U.S. 264 (1980), one of *Massiah*'s progeny. *Moulton*, 474 U.S. at 174.

[29] *Moulton*, 474 U.S. at 174-75.

[30] *Id.* at 176.

[31] *Id.*

[32] *Id.*

conversations with his co-defendant, namely, to investigate a possible plan to kill a witness.[33] The Supreme Court recognized the legitimate interest the State has in investigating new crimes but held that such an interest was not sufficient to justify admitting incriminating statements relating to the pending charges at the trial of those charges:

> To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.[34]

But the State was free to introduce incriminating statements pertaining to other crimes—those to which the Sixth Amendment right had not yet attached—at the trial of those other crimes.[35]

From this discussion, we conclude that the *Massiah* inquiry is whether, after the Sixth Amendment right to counsel has attached, the government has knowingly circumvented the defendant's right to counsel by using an undisclosed government agent to deliberately elicit incriminating information. We turn to the various *Massiah* issues implicated in the present case.

### B. Attachment

#### 1. *Attached in Ector County*

---

[33] *Id.* at 178.

[34] *Id.* at 180.

[35] *Id.* at 180 n.16.

The Sixth Amendment right to counsel does not apply until it has attached, and it attaches when the prosecution has commenced.[36] The prosecution commences for Sixth Amendment right-to-counsel purposes "at the first appearance before a judicial officer at which the defendant is told of the formal accusation against him and restrictions are imposed on his liberty."[37] Under this test for attachment, appellant's Sixth Amendment right to counsel with respect to the Ector County charges had attached before the recorded phone conversations took place.

### 2. *Not Attached to Midland County Offenses*

But the Sixth Amendment right to counsel is "offense specific." It attaches only to an offense for which a prosecution has been initiated.[38] This offense-specific rule of attachment applies in the *Massiah* context.[39] The question, then, is whether the recorded conversations in this case involved offenses that were separate from the Ector County charges, and if so, to what extent.

In determining what constitutes an "offense" for Sixth Amendment right-to-counsel purposes, and consequently, whether separate offenses are involved, the Supreme Court has resorted to double-jeopardy law.[40] The Court has explained that this means that offenses are considered separate for

---

[36] *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008).

[37] *Id.* at 194.

[38] *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001).

[39] *Moulton*, 474 U.S. at 179-80 & n.16. *See also United States v. Holness*, 706 F.3d 579, 589-91 (4th Cir. 2013); *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006).

[40] *Cobb*, 532 U.S. at 172-73 ("[W]e have recognized in other contexts that the definition of an 'offense' is not necessarily limited to the four corners of a charging instrument . . . . We see no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel.").

right-to-counsel purposes if they would be considered separate under the *Blockburger*[41] same-elements test, *i.e.* each statutory provision proscribing the respective charges requires proof of a fact that the other does not.[42]

The *Blockburger* same-elements test is not the only tool for evaluating whether offenses are separate for double-jeopardy purposes, and it is legitimate for right-to-counsel purposes to examine whether the offenses at issue would be considered separate under other double-jeopardy doctrines.[43] Offenses that have the same elements under the *Blockburger* test are nevertheless separate if they involve separate allowable units of prosecution.[44] Separate instances of sexual assault are separate offenses.[45] The same is true of the offense of indecency with a child by contact.[46] To the extent that multiple incidents conform to the charges, however, they are subsumed by the charges for double-jeopardy purposes until and unless the State timely elects what specific offense is being charged.[47]

---

[41] *Blockburger v. United States*, 284 U.S. 299 (1932).

[42] *Cobb*, 532 U.S. at 173. *See also Blockburger*, 284 U.S. at 304.

[43] *See Holness*, 706 F.3d at 590 (observing, in *Massiah* context, that "federal and state crimes are not the same offense, no matter how identical the conduct they proscribe").

[44] *Blockburger*, 284 U.S. at 302-03 (second illegal drug sale "was not the result of the original impulse, but of a fresh one—that is to say, of a new bargain"); *Sanabria v. United States*, 437 U.S. 54, 69-70 (1978) (discussing concept of "allowable unit of prosecution"); *Ex parte Hawkins*, 6 S.W.3d 554, 556-57 & n.8 (Tex. Crim. App. 1999) (for a double-jeopardy violation to occur, offenses must be the same both in law and in fact, the latter being an allowable-unit-of-prosecution inquiry).

[45] *Ex parte Goodbread*, 967 S.W.2d 859, 861 (Tex. Crim. App. 1998).

[46] *See Pizzo v. State*, 235 S.W.3d 711, 719 (Tex. Crim. App. 2007) (holding the offense of indecency with a child by contact is a conduct-oriented offense and analyzing it in the same way as the offense of sexual assault).

[47] *Dixon v. State*, 201 S.W.3d 731, 735 (Tex. Crim. App. 2006); *Goodbread*, 967 S.W.2d at 861 & n.3.

So, multiple incidents in Ector County would be included in the Ector County complaint and arrest warrant, but any sexual offenses committed solely[48] in Midland County would be separate, for double-jeopardy purposes, from the sexual offenses that were the subject of prosecution in Ector County. No one contends that a prosecution was pending in Midland County at the time of the recorded phone conversations. The Sixth Amendment right to counsel, therefore, had not attached to any offenses committed solely in Midland County.

### 3. *Ector County Prosecution*

But the present case involves an Ector County prosecution, not a Midland County prosecution. We held in *Thompson* that the right to counsel may be violated by the elicitation of evidence of extraneous offenses if that evidence is used in the prosecution for which charges had been pending. In *Thompson*, the defendant had been charged with capital murder when law enforcement learned that he might be attempting to solicit the murder of one of the witnesses against him.[49] An investigator for the District Attorney's office posed as a hit-man and engaged in discussions with the defendant that were secretly recorded.[50] The investigator was aware that appellant was represented by counsel in connection with the capital-murder charge.[51] At the punishment phase of the defendant's capital-murder trial, the State introduced the recording, which

---

[48] We do not address the offense of continuous sexual abuse of a young child, in which it is possible for some of the elements to be committed in more than one county. *See* TEX. PENAL CODE § 21.02.

[49] 93 S.W.3d at 22.

[50] *Id.* at 22-23.

[51] *Id.* at 23.

contained statements about the extraneous crime of solicitation of murder.[52] We explained that a Sixth Amendment violation occurs if an undercover police agent interrogates the defendant, without counsel, on matters that the police knew or should have known would elicit incriminating evidence pertaining to the pending charges.[53] We concluded that the defendant's right to counsel was violated because, though the defendant's incriminating statements related solely to an extraneous offense, they were used against him at the capital murder trial:

> The information was elicited by an agent of the State, without notifying appellant's counsel, and was then used at appellant's capital murder trial to help the State establish that appellant posed a continuing threat to society. The State knew the capital murder charges were pending against appellant at the time, and that any evidence incriminating appellant in another offense would probably be used against him in the capital punishment phase. We hold appellant's Sixth Amendment right to counsel was violated by the State's actions in soliciting the tape recorded conversation between appellant and Johnson and using it against appellant in the punishment phase of his capital murder trial, the charges of which were pending at the time of the conversation.[54]

Under this reasoning, even if the Midland County offenses are separate offenses from the Ector County offenses, the recorded statements could not be used against appellant in the Ector County case.

However, our holding in *Thompson* may have been called into question by the later Supreme Court decision in *Kansas v. Ventris*,[55] which articulated views similar to those held by the dissents in *Thompson*. The dissent on original submission in *Thompson* argued that the Court had

---

[52] *Id.*

[53] *Id.* at 25.

[54] *Id.* at 27.

[55] 556 U.S. 586

expansively interpreted the Sixth Amendment right to counsel at odds with the Supreme Court's decision in *Cobb*.[56] The dissent contended that whether "the extraneous offense [had] probative value in a prosecution for the charged offense is immaterial because it is still an extraneous offense" to which the "right to counsel had not attached."[57] In a dissent to the refusal to grant rehearing, Judge Keasler contended that any "Sixth Amendment violation occurs at the moment that the statements are obtained."[58] "If such a violation occurs," Judge Keasler maintained, "the statements are inadmissible at trial—at any trial—of the accused for any offense."[59] "Conversely," Judge Keasler continued, "if the statements are legally obtained, they are admissible, if relevant, at any trial of the accused for any offense."[60]

In *Ventris*, the Supreme Court acknowledged that *Massiah* had been equivocal about whether the right to counsel was violated at the moment of questioning or only when the evidence was used against the accused at trial.[61] When, exactly, the violation occurred was not important to the decision in *Massiah*.[62] When confronted with that question in *Ventris*, the Supreme Court concluded that "the *Massiah* right is a right to be free of uncounseled interrogation, and is infringed at the time of interrogation":

---

[56] *Thompson*, 93 S.W.3d at 30-31 (Keller, P.J., dissenting).

[57] *Id.* at 31.

[58] *Thompson v. State*, 108 S.W.3d 269, 270 (Tex. Crim. App. 2003) (Keasler, J., dissenting to refusal to grant rehearing)

[59] *Id.*

[60] *Id.* at 270.

[61] 556 U.S. at 591-92.

[62] *Id.* at 592.

It is illogical to say that the right is not violated until trial counsel's task of opposing conviction has been undermined by the statement's admission into evidence . . . . We have never said . . . that officers may badger counseled defendants about charged crimes so long as they do not use information they gain. The constitutional violation occurs when the uncounseled interrogation is conducted.[63]

But even if *Ventris* undermines this Court's holding in *Thompson*, the present case is different from *Thompson* in a way that is adverse to the State.

### 4. *Dual-Use Evidence*

In her questions on the recording, J.S. made no attempt to distinguish between the offenses that occurred in Midland and those that occurred in Odessa. She was simply trying to get appellant to admit that he had committed sexual offenses against her. Appellant's evasive answers also failed to provide any distinction between Midland and Odessa offenses. Just as the *Moulton* decision recognized that some criminal investigations have "dual purposes,"[64] relating to both charged and uncharged crimes, we recognize that evidence elicited in criminal investigations can sometimes have dual uses, being evidence of both charged and uncharged crimes. Judge Keasler recognized such a possibility in his dissent in *Thompson*:

Of course, if a statement incriminates a defendant with regard to two separate offenses simultaneously, one a charged offense and one an uncharged offense, then that particular statement could be inadmissible at one trial and admissible at the other.[65]

Judge Keasler's hypothetical is exactly what occurred here. Consequently, appellant's Sixth

---

[63] *Id.*

[64] 474 U.S. at 179 n.15 ("We take what we feel is a more realistic view of police investigations, and instead accept that dual purposes may exist whenever police have more than one reason to investigate someone.").

[65] *Thompson*, 108 S.W.3d at 270 (Keasler, J., dissenting to refusal to grant rehearing).

Amendment right to counsel had attached with respect to the recordings insofar as they were relevant to the Ector County prosecutions.

### C. Knowing Circumvention

In *Moulton*, the Supreme Court indicated that a *Massiah* violation occurs only if the State "knowingly circumvented" the right to counsel.[66] The court of appeals's opinion suggests that a knowing circumvention did not occur because Midland law enforcement was unaware that appellant had counsel. Appellant's position is that the knowledge of Ector County law enforcement should be imputed to Midland County law enforcement.

Appellant has the better of the argument. In *Michigan v. Jackson*, the Supreme Court held that the State is responsible, in the Sixth Amendment context, for the knowledge of all of its actors:

> Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court).[67]

In so concluding, the Supreme Court cited and quoted from *Moulton*, a *Massiah* case.[68] It is true that, in *Montejo v. Louisiana*,[69] the Supreme Court overruled *Jackson* insofar as it imposed a prophylactic rule forbidding interrogation once the accused has requested counsel.[70] But the *Montejo* decision expressly stated that it was not concerned with the substantive scope of the Sixth

---

[66] *See* this opinion, *ante*.

[67] 475 U.S. at 634.

[68] *Jackson*, 475 U.S. at 634 n.8.

[69] 556 U.S. 778 (2009).

[70] *Montejo*, 556 U.S. at 780-81, 797, 799.

Amendment right to counsel, and in so saying it cited both *Moulton* and *Massiah*.[71] We do not agree

with the court of appeals that the Supreme Court's decision to overrule *Jackson* constituted an

abandonment of the rule of imputing knowledge to the State.[72]

### D. Government Agent

Having determined that the right to counsel had attached with respect to the recordings and

that knowledge of that attachment, and that appellant had counsel, must be imputed to Midland law

enforcement, we now address whether J.S. was a government agent. The rule in *Massiah* applies

---

[71] *Id.* at 791 ("Montejo contends that our decisions support his interpretation of the *Jackson* rule. We think not. Many of the cases he cites concern the substantive scope of the Sixth Amendment—*e.g.*, whether a particular interaction with the State constitutes a 'critical' stage at which counsel is entitled to be present—not the validity of a Sixth Amendment waiver. Since everyone agrees that absent a valid waiver, Montejo was entitled to a lawyer during the interrogation, those cases do not advance his argument.") (citations omitted).

[72] A different result may occur if the agent at issue worked for a different sovereign than the one who conducts the prosecution—such as a different state or the federal government. *See Holness*, 706 F.3d at 590. *See also Ex parte Doan*, 369 S.W.3d 205, 215-16 (Tex. Crim. App. 2012) (Keller, P.J., dissenting) (observing that the federal government, the various states, and Indian tribes are separate sovereigns for double-jeopardy purposes, but cities are not separate sovereigns). We do not have that situation here.

The court of appeals and the State express concern that this rule will place an undue burden on law enforcement in one county to know what other counties are doing, but we find such a concern to be unpersuasive. Nothing in this opinion prevents a county from using undisclosed agents to investigate uncharged crimes committed within that county and then using such evidence in a later prosecution conducted by that county. The State's suggestion that a "Pandora's box" of claims would be opened is misplaced. Defendants will not be able to lodge successful Sixth-Amendment claims simply because they have been charged with similar crimes in different jurisdictions. The Sixth Amendment was implicated here because the right to counsel had attached in Ector County and because the statements on the recordings incriminated appellant with regard to the Midland and Ector County offenses *simultaneously*. And even in that situation, we are simply holding that the recordings would be inadmissible in Ector County. Nothing in our opinion today prevents the State from admitting the recordings in a prosecution for offenses occurring in Midland County.

only if the person who elicited statements from the defendant was a government agent.[73]

In *Manns v. State*, we observed that there were some differences in the approaches of various jurisdictions regarding this issue, but the jurisdictions were unified by at least one common principle: "to qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official."[74] We were not required to specify in greater detail what makes someone a government agent for *Massiah* purposes because the informant in *Manns* had acted entirely on his own volition, without any promises, encouragement, or instructions from the government, and was therefore not a government agent.[75] We must now explore in more detail the issue of what makes someone a government agent.

As we observed in *Manns*, some of the federal circuits espouse a bright-line test that an informant becomes a government agent "when the informant has been instructed by the police to get information about a particular defendant."[76] The Supreme Court of California has suggested that an informant becomes a government agent if he acts "under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage."[77] The Fifth Circuit held that the informant in one case was not a government agent because the evidence

---

[73] *Manns v. State*, 122 S.W.3d 171, 178-89 (Tex. Crim. App. 2003).

[74] *Id.* at 183.

[75] *Id.* at 188 (The informant "was an entrepreneur who exploited [the defendant] for his own gain. The government did nothing to encourage [his] behavior but merely accepted the information.").

[76] *Id.* at 183.

[77] *People v. Dement*, 53 Cal. 4th 1, 33, 264 P.3d 292, 318 (2011).

failed to show a *quid pro quo* and it failed to show instruction or control by the State.[78]  Because the defendant had shown neither, the Fifth Circuit did not address whether both of those elements must be shown in order to establish an agency relationship.[79]  Other jurisdictions have said that someone was not a government agent if he was not instructed by the police or not promised something of value for the information.[80]

Citing *Manns* as a case that "surveyed the approaches of various jurisdictions," the Supreme Court of Kentucky concluded that the existence of an agency relationship depends upon the existence of an agreement between the government and the informant at the time the information was obtained.[81]  However, the Kentucky court rejected the notion that a *quid pro quo* must also underlie the relationship.[82]  Similarly, the Ninth Circuit has held that an agreement to compensate the informant for his services was not required.[83]  It is enough, the court held, that "the State made a conscious decision to obtain [the informant's] cooperation and that [the informant] consciously decided to provide that cooperation."[84]

We conclude that J.S. was a government agent.  The Midland police encouraged J.S. to call appellant for the purpose of eliciting a confession.  They also supplied J.S. with the recording

---

[78]  *Creel v. Johnson*, 162 F.3d 385, 394 (5th Cir. 1998)

[79]  *Id.*

[80]  *See State v. Krause*, 64 Haw. 522, 526, 644 P.2d 964, 968 (1982) (citing *State v. Olson*, 274 N.W.2d 190 (N.D. 1978)).

[81]  *McBeath v. Commonwealth*, 244 S.W.3d 22, 32 (Ky. 2007).

[82]  *Id.* at 33.

[83]  *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004)

[84]  *Id.*

equipment, and an officer was present during the calls. We do not attempt at this time to establish a comprehensive rule for what makes an individual a government agent for *Massiah* purposes. We hold simply that J.S. was a government agent under the facts of this case.

### E. Deliberately Elicit

The next question is whether J.S. "deliberately elicited" incriminating statements from appellant. In *State v. Maldonado*, we surveyed the Supreme Court's cases regarding the meaning of the Sixth Amendment's "deliberately elicited" requirement and concluded that it encompassed a broader range of activity than the Fifth Amendment concept of interrogation.[85] Interrogation would certainly qualify as deliberate elicitation for *Massiah* purposes, but it is not required.[86] "Deliberate elicitation" simply involves "some conduct designed to obtain incriminating statements."[87] Such conduct has not occurred if the informant is merely a passive "listening post" who relates any statements the defendant makes of his own volition.[88] In *Maldonado*, we further concluded that a police officer's act of introducing himself was not sufficient to constitute deliberate elicitation.[89]

There were times on the recording when J.S. engaged in explicit interrogation, such as when she asked appellant why he had touched her and why he had sex with her. At other times, J.S. made statements that fell short of interrogation but were nevertheless designed to invoke incriminating responses. After all, the purpose of the calls was to elicit incriminating evidence. Although some

---

[85] 259 S.W.3d 184, 189-90 (Tex. Crim. App. 2008).

[86] *Id.* at 190.

[87] *Id.*

[88] *Id.* at 191.

[89] *Id.*

of the statements made by J.S. on the recordings were entirely innocuous, the incriminating relevance of the recordings flowed from J.S.'s attempts to elicit incriminating admissions. We readily conclude that deliberate elicitation has been shown.

### E. Waiver

The State cites *Montejo* and *Pecina v. State*[90] for the proposition that a defendant who invokes his right to counsel by requesting an appointed attorney from a magistrate can still waive his right to counsel and talk to police during custodial interrogations. The State then points out that appellant's conversations with J.S. did not even amount to custodial interrogation, and the State claims that appellant's "conversations with J.S. were purely voluntary on his part and he would certainly have been free to decline to speak to her at all." In saying that appellant was free to decline to speak to J.S., the State implicitly suggests that appellant waived his right to counsel by choosing to speak to her.

The Supreme Court, however, has indicated that waiver does not apply in the *Massiah* context:

> [T]he concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government. In that setting, [the defendant], being unaware that [the informant] was a Government agent expressly commissioned to secure evidence, cannot be held to have waived his right to the assistance of counsel.[91]

Nevertheless, some courts have held or suggested that a waiver can occur when the informant is the complaining witness. In *Jenkins v. Leonardo*, the Second Circuit held that the defendant

---

[90] 361 S.W.3d 68 (Tex. Crim. App. 2012).

[91] *Henry*, 447 U.S. at 273.

waived his right to counsel when he called the complaining witness.[92] The court acknowledged that "a criminal defendant will not ordinarily be held to have assumed the risk that those to whom he speaks (after his right to counsel has attached) are state agents."[93] But the court found that the confluence of several factors showed that the defendant had effectively waived his right to counsel in its case.[94] First, the defendant had been given *Miranda* warnings, though the court gave this fact little weight because the warnings had been administered several months before the conversation at issue.[95] Second, and more importantly, it was the defendant who initiated the phone call to the complaining witness.[96] The appellate court held that this was important, in part, because the complaining witness's status as a government agent was not undisclosed—because the defendant knew that the complaining witness was cooperating with the government.[97] In connection with this point, the court also observed that appellant did not simply initiate contact, "he aggressively pursued it, making repeated calls."[98] Thus, the defendant "brazenly made harassing phone calls to his rape victim, fully aware that she had cooperated with the police in the past."[99] Third, the court found that it was "absurd to suppose that [the defendant] wanted counsel to be present at—or even aware

---

[92] 991 F.3d 1033, 1037-39 (2ᵈ Cir. 1993).

[93] *Id.* at 1037.

[94] *Id.* at 1038.

[95] *Id.*

[96] *Id.*

[97] *Id.* at 1037 & n.2, 1038. The appellate court observed that the trial court had made a specific finding as to this fact. *Id.* at 1037.

[98] *Id.* at 1039.

[99] *Id.*

of—his conversations with [the complaining witness] because the purpose of [his] call was to scare or bribe [the complaining witness] into changing her story."[100] Finally, the Second Circuit observed that the defendant was "no stranger to the criminal justice system," as he had been convicted of several prior crimes.[101]

In *People v. Wojtkowski*, a California appellate court held *Massiah* to be inapplicable where the defendant called the complaining witness, his wife.[102] The court explained that "no one twisted [the defendant's] arm to place telephone calls to his wife."[103] The defendant "knew that his wife was a prosecution witness, and the very purpose of his call was to dissuade her from proceeding with the prosecution."[104] Moreover, the complaining witness's few references to the crime were in response to the defendant's suggestion that she discourage prosecution of the offense.[105] The court concluded that the wife "was not an agent provocateur.*"[106]

In *State v. Berry*, a Missouri court of appeals held *Massiah* to be inapplicable to statements made to the complaining witness, though he occupied a cell adjacent to the defendant's at the time.[107] The court explained that (1) the complaining witness was neither a paid informant nor an agent for

---

[100] *Id.*

[101] *Id.*

[102] 167 Cal. App. 3d 1077, 1081-83, 213 Cal. Rptr. 846, 849-50 (1985).

[103] *Id.* at 1082, 213 Cal. Rptr. at 849.

[104] *Id.* at 1082, 213 Cal. Rptr. at 850.

[105] *Id.* at 1082, 213 Cal. Rptr. at 849.

[106] *Id.* at 1083, 213 Cal. Rptr. at 850.

[107] 658 S.W.2d 476, 478 (Mo. App. 1983).

the State, (2) the defendant and the complaining witness did not share a common plight, given that the complaining witness was a victim of the defendant's acts, and (3) the placement of the complaining witness in an adjacent cell was inadvertent and the complaining witness was moved within three to five minutes after the placement was realized.[108] The court observed that the defendant "was obviously aware that the witness . . . had a relationship with the prosecution that made it certain that that witness would report anything that defendant said to [the] prosecution."[109]

We recognize that most cases involving alleged *Massiah* violations involve co-defendants or jailhouse informants and do not involve an informant so obviously adverse to the defendant as the complaining witness usually is. Only a few cases have addressed the application of *Massiah* to statements that a complaining witness elicits from the defendant. But the few cases that have done so, and found no *Massiah* violation, are readily distinguishable from the present case. Unlike the defendants in *Jenkins* and *Wojtkowski*, appellant did not initiate the calls to the complaining witness. The complaining witness initiated the calls, and she made statements during the calls that were designed to lull appellant into believing that she was not adverse to him. And unlike the authorities in *Berry*, the Midland police encouraged J.S. to contact appellant for the purpose of eliciting a confession, and they provided recording equipment to her to memorialize any incriminating statements. We conclude that appellant did not waive his right to counsel.

### III. DISPOSITION

The recordings were made in violation of appellant's right to counsel with respect to the Ector County prosecution. We reverse the judgment of the court of appeals and remand the case to

---

[108] *Id.*

[109] *Id.*

that court for further proceedings consistent with this opinion.

Delivered: March 19, 2014
Publish