**Opinion filed August 21, 2015**



# In The

# Eleventh Court of Appeals

_____

## No. 11-11-00028-CR

_____

## ROBERT RUBALCADO, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 358th District Court**

**Ector County, Texas**

**Trial Court Cause No. D-36,711**

## MEMORANDUM OPINION ON REMAND

A jury convicted Robert Rubalcado of nine counts of indecency with a child, four counts of sexual assault of a child, and seven counts of aggravated sexual assault of a child. The jury assessed punishment at confinement for a term of twenty years for each count of indecency with a child, twenty years for each count of sexual assault of a child, and life imprisonment for each count of aggravated sexual assault of a child. The sentences were to run concurrently. In an earlier opinion, we affirmed Appellant's convictions. *Rubalcado v. State*, No. 11-11-00028-CR, 2013

WL 364233 (Tex. App.—Eastland Jan. 31, 2013), *rev'd*, 424 S.W.3d 560 (Tex. Crim. App. 2014). In doing so, we held that the trial court did not abuse its discretion when it admitted recordings of "pretextual" phone calls between J.S. and Appellant. *Id.* at *9–13. Appellant petitioned the Court of Criminal Appeals for discretionary review, arguing that the admission of the phone calls violated his Sixth Amendment right to counsel. *Rubalcado v. State*, 424 S.W.3d 560, 563 (Tex. Crim. App. 2014). The Court of Criminal Appeals held that the trial court's admission of the phone calls violated Appellant's right to counsel with respect to the Ector County prosecution. *Id.* at 578. The Court of Criminal Appeals reversed the judgment of this court and remanded the case back to us. *Id.* We reverse and remand for a new trial.

*Scope of Review on Remand*

As a preliminary matter, it is necessary for us to determine the scope of the matters to be determined upon remand. The Court of Criminal Appeals reversed our determination that Appellant's Sixth Amendment right to counsel was not violated. *Id.* The court remanded the case back to this court "for further proceedings consistent with [its] opinion." As set forth below, we conclude that the Court of Criminal Appeals remanded the case back to this court for the purpose of conducting a harm analysis applicable to constitutional errors. *See* TEX. R. APP. P. 44.2(a). In reaching this conclusion, we are mindful of the recent decision of the Amarillo Court of Appeals wherein the court concluded that the Court of Criminal Appeals determined that the error occurring in the trial below constituted structural error that was not subject to a harm analysis. *Darcy v. State*, No. 07-13-00297-CR, 2015 WL 3941794, at *4 (Tex. App.—Amarillo June 25, 2015, no pet. h.) (mem. op., not designated for publication) (citing *Rubalcado*, 424 S.W.3d at 578). We respectfully disagree with our sister court's reading of the opinion from the Court of Criminal Appeals.

2

If the Court of Criminal Appeals had determined that the error below constituted structural error, there would have been no need for the court to have remanded the case back to this court—it would have simply remanded the case back to the trial court for a new trial. The Court of Criminal Appeals followed this procedure in *Steadman v. State* when it determined that a violation of a defendant's Sixth Amendment right to a public trial was a structural error that did not require a showing of harm. *Steadman v. State*, 360 S.W.3d 499, 510–11 (Tex. Crim. App. 2012). The court simply remanded the case to the trial court for a new trial. *Id.*

Furthermore, the error at issue in the present case is undoubtedly a trial error that is subject to harmless error review. A "structural" error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *Mendez v. State*, 138 S.W.3d 334, 340 (Tex. Crim. App. 2004). A "trial error" is one "which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether" the error "was harmless." *Fulminante*, 499 U.S. at 307–08; *Johnson v. State*, 169 S.W.3d 223, 237 (Tex. Crim. App. 2005). A structural error is not subject to a harm analysis because it defies analysis by harmless error standards. *Mendez*, 138 S.W.3d at 338. Most constitutional errors are not structural. *Id.* at 340 (citing *Fulminante*, 499 U.S. at 306). The Supreme Court has only found structural errors in a "very limited class of cases." *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 468–69 (1997)). A *complete* denial of counsel is a structural defect that affects the framework of the trial. *Williams v. State*, 252 S.W.3d 353, 357 (Tex. Crim. App. 2008) (citing *Johnson*, 520 U.S. at 468–69); *Calamaco v. State*, 462 S.W.3d 587, 593 (Tex. App.—Eastland 2015, pet. filed). This case does not involve a complete denial of counsel because Appellant was represented by counsel at trial. This case involves the admission of recordings made in violation of

Appellant's Sixth Amendment right to counsel. This was a trial error because it occurred during the presentation of the case to the jury, and it may be quantitatively assessed in the context of the other evidence presented at trial in order to determine whether the error was harmless. *Fulminante*, 499 U.S. at 307–08.

*Analysis*

We note at the outset that the two previous opinions issued in this case contain very detailed accounts of the evidence presented at trial. *Rubalcado*, 424 S.W.3d 560 (Court of Criminal Appeals's opinion); *Rubalcado*, 2013 WL 364233 (court of appeals's opinion). We will only recite those facts necessary for our determination of the issue now before us.

The underlying prosecution arose from allegations of inappropriate conduct between Appellant and his girlfriend's daughter, J.S. Appellant and J.S. resided in the same household in Midland County beginning in 2002. They moved to neighboring Ector County in 2004. The alleged inappropriate conduct occurred in both counties. The underlying prosecution arose from acts alleged to have occurred in Ector County. After Appellant was arrested in Ector County and released on bail, Midland police officers asked J.S. to make pretextual phone calls to Appellant in an effort to induce Appellant to confess to committing crimes against J.S. J.S. made three pretextual telephone calls to Appellant. Each call was recorded on recording equipment provided to J.S. by the Midland Police Department. J.S. called Appellant on three different days in September 2009: the 10th, 23rd, and 29th. As noted by the Court of Criminal Appeals, "At least one Midland police officer was with J.S. during each call, but the police did not tell J.S. what to say." *Rubalcado*, 424 S.W.3d at 564.

The Court of Criminal Appeals determined that Appellant's Sixth Amendment right to counsel had attached with respect to the Ector County charges before the phone conversations took place. *Id.* at 570. Conversely, the court also

4

determined that Appellant's Sixth Amendment right to counsel had not attached to any offenses committed solely in Midland County because no prosecution was pending in Midland County at the time of the recorded phone conversations.[1] *Id.* at 570–71. The court determined that the recorded phone conversations constituted "dual-use evidence" because there was no attempt by J.S. to distinguish between offenses that occurred in Midland County and those that occurred in Ector County. *Id.* at 573. The court further determined that the knowledge of Ector County law enforcement that Appellant's Sixth Amendment right to counsel had attached should be imputed to Midland County law enforcement. *Id.* at 573–74. The court also concluded that J.S. was a government agent with respect to the recorded telephone conversations because the Midland police encouraged her to call Appellant for the purpose of eliciting a confession, because they supplied the recording equipment, and because an officer was present during the calls. *Id.* at 574–76. The court further determined that J.S. deliberately elicited incriminating statements from Appellant and that Appellant did not waive his right to counsel by choosing to speak to J.S. *Id.* at 576–78. Accordingly, the court concluded that the admission of the recorded phone conversations violated Appellant's Sixth Amendment right to counsel. *Id.*

The admission of evidence obtained in violation of a defendant's Sixth Amendment right to counsel constitutes constitutional error. *Thompson v. State*, 93 S.W.3d 16, 27 (Tex. Crim. App. 2001). Therefore, under the provisions of Rule 44.2(a) of the Texas Rules of Appellate Procedure, we will reverse for constitutional error unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *see Calamaco*, 462 S.W.3d at 594. Error does not contribute to the conviction if the jury's verdict would have been the same even if the erroneous evidence had not been

---

[1] We express no opinion on the admissibility of the recorded phone conversations in any criminal proceeding other than the underlying prosecution from Ector County.

admitted.  *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007).  An appellate court's primary concern is the effect the error had, or reasonably may have had, on the jury's decision.  *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).  In determining whether the error contributed to a defendant's conviction, we consider the nature of the error, the State's emphasis on the error, the error's probable collateral implications, and the weight a juror would probably place on the alleged error.  *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011).

The first phone call lasted approximately seven and one-half minutes.  J.S. and Appellant talked about J.S.'s school and her new car.  Appellant spoke extensively about his relationship with God and how "God was the center of [his] life."  Appellant said that he had strayed away but that God "brought me back and I am so glad of that."  Appellant admitted that he was "changing slowly by slowly.  God is still working on me."  J.S. told Appellant that she "want[ed] to go home already."  Appellant replied, "I know, baby.  My phone battery is low.  You can call me back later on or tomorrow, okay?"

The second phone call was twelve and one-half minutes long.  Appellant and J.S. discussed recent family activities and her upcoming graduation.  J.S. asked, "Do you think I will be able to come home?"  Appellant replied, "Yes.  We have got to take a few steps, baby.  Just a few steps to take."  J.S. asked what she would have to do.  Appellant told her, "First, I mean, at least talk to my lawyer," and "I mean, the thing that you have to talk to the lawyer about, you understand, you know, I don't want nothing to happen, you know.  That thing that happened, nothing happened, I was mad."  Appellant continued to talk about God, J.S. coming home, being a good father to J.S., and being a family again.  Near the end of the phone call, Appellant mentioned, "Dropping the charges and that way I can get you home."  Right before Appellant and J.S. ended the call, Appellant again stated, "And we will start working on this dropping these charges and stuff and we will get you home."

The final phone call lasted over twenty-five minutes. After a few minutes, J.S. said that Appellant wanted her to talk to his lawyer. Appellant responded, "Yeah. Mainly I think it is the DA." Appellant and J.S. talked for several minutes about God, changing, and having a better attitude, and Appellant said, "I am saying whatever God is telling you to do, you do it. Don't feel pressured or anything." J.S. asked Appellant if she could ask him a question. Appellant answered affirmatively. J.S. asked, "Can I ask you why you were doing those things to me?" Appellant responded, "Do what?" J.S. replied, "The way you were touching me and stuff like that." Appellant answered that J.S. and her mom and him would have to get together and that "[w]e will come back to that." J.S. then asked, "Why did you -- why did you have sex with me?" Appellant changed the subject and asked whether J.S. wanted to come back home.

J.S. and Appellant talked about dropping the charges again. J.S. asked Appellant what she should tell the district attorney. Appellant responded that the district attorney would ask her: "Why do you want to drop charges?" Then Appellant said:

> I mean, I am not telling you what to do, or coaching you in any way, shape or form, but, you know, I heard some cases that people have told me, do you want to press charges? No. Did it happen? No. Did they do this? No. Did they do this? No. Are you going to testify against him? No. And that's how I heard that some cases have gone before. No, no, no, no, no.

Later in the phone call, J.S. wanted to know if anything bad would happen to her if she moved back. Appellant said, "No, I mean, nothing is going to happen. We all change. Nothing is going to happen with anyone." Appellant continued, "I am not going to do nothing but pray to God." Right before the phone call ended, Appellant asked J.S. to please talk to the lawyers. J.S. again asked Appellant why

he touched her. Appellant avoided the question and said that God knows everything. Appellant never denied the assaults.[2]

After reviewing the entire record, we cannot determine beyond a reasonable doubt that the error did not contribute to Appellant's convictions. As detailed above, many of Appellant's statements were inculpatory in nature, and the jury likely placed a great deal of weight on them. In this regard, Appellant did not testify on his behalf at trial during the guilt/innocence phase. The State placed a great deal of emphasis on the recorded phone conversations in both opening and closing statements. In the State's opening statement, the prosecutor stressed the pretextual phone calls. The prosecutor said, "And in those phone calls, you are going to hear [Appellant] say he is sorry. And you are also going to hear [J.S.] completely confront him and ask him, 'Why did you touch me?' And a normal person would react by saying, 'I didn't. I didn't touch you. What are you talking about?'" The prosecutor continued, "What you are going to hear on those tapes is that the defendant changed the subject completely. And then [J.S.] is going to ask him, 'Why did you have sex with me?' And you are going to hear silence. And you are going to hear that subject change again completely. But you are not going to hear, ever, is a denial." In closing arguments, the State emphasized the phone calls and played them again for the jury. The State spent more than half of closing argument discussing the phone calls. The State repeatedly mentioned that Appellant told J.S. to talk to his lawyer and the district attorney about dropping the charges. Additionally, there is a reasonable likelihood that the erroneous admission of the recorded phone conversations affected the jury's orderly evaluation of the evidence because there were several objections, exchanges, bench conferences, and conferences outside the presence of the jury over whether to admit the phone calls.

---

[2]The opinion from the Court of Criminal Appeals also contains extensive details about the three recorded phone conversations. *Rubalcado*, 424 S.W.3d at 564–66.

The Court of Criminal Appeals determined that the recorded phone conversations constituted dual-use evidence with reference to offenses occurring in Ector County versus offenses occurring in Midland County. *Rubalcado*, 424 S.W.3d at 573. The court based this determination upon the fact that J.S. made no attempt to distinguish between the offenses that occurred in one county versus the other county. *Id.* The dual-use nature of the recorded phone conversations extends to the twenty convictions arising from the underlying Ector County prosecution because J.S.'s questions were general in nature and made no effort to distinguish one particular act from another.

We have no assurance that the jury's verdict would have been the same even if the erroneous evidence had not been admitted. Accordingly, we cannot say beyond a reasonable doubt that the admission of the pretextual calls did not contribute to Appellant's convictions. Appellant's third issue is sustained. We need not consider Appellant's other issues in light of our ruling on his third issue.

*This Court's Ruling*

We reverse the judgments of the trial court and remand this cause to the trial court for a new trial.


JOHN M. BAILEY
JUSTICE


August 21, 2015

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.