

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,062

### GABRIEL PAUL HALL, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 11-06185-CRF-272
### IN THE 272ND DISTRICT COURT
### BRAZOS COUNTY

**HERVEY, J., delivered the opinion of the Court.**

### O P I N I O N

In September 2015, a jury convicted Appellant of the 2011 murder of Edwin

Shaar, Jr. in the course of committing or attempting to commit burglary.  TEX. PENAL

CODE § 19.03(a)(2).  Based on the jury's answers to the special issues set forth in Texas

Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court

sentenced Appellant to death. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1] Direct

appeal to this Court is automatic. Art. 37.071, § 2(h).

Appellant raises fifteen points of error. After describing the facts of the offense

and the evidence presented at trial, we will begin our analysis by first disposing of point

of error seven, in which Appellant claims that the evidence was insufficient to support the

jury's affirmative response to the future-dangerousness special issue. We will then

address Appellant's remaining points of error. Because we conclude that Appellant's

points of error are without merit, we will affirm the trial court's judgment of conviction

and sentence of death.

## I. BACKGROUND

### A. Guilt Phase Evidence

On October 20, 2011, eighteen-year-old Appellant entered the garage of sixty-

eight-year-old Edwin Shaar, Jr. ("Ed") and murdered him in a manner that even

Appellant describes in his brief as "extended, violent, and bloody." Appellant stabbed Ed

multiple times, inflicting deep wounds to his face, neck, and upper back. Ed, who

suffered from Parkinson's Disease, struggled to defend himself, sustaining additional

scrapes and bruises all over his body. Eventually, Appellant shot Ed point blank in the

forehead, killing him. After he shot Ed, Appellant entered Ed's house and tried to shoot

Ed's wheelchair-bound wife, Linda—but the gun jammed. So, as Linda frantically

---

[1] Unless otherwise indicated, all subsequent citations in this opinion to "Articles" refer to the Texas Code of Criminal Procedure and all subsequent citations to "Rules" refer to the Texas Rules of Evidence.

begged a 9-1-1 operator for help, Appellant moved behind Linda's wheelchair and slashed her throat. Afterwards, Appellant left the house without taking anything.

Police officers responding to Linda's 9-1-1 call found her inside the house, covered in blood, and struggling to breathe. On her way to the hospital, Linda was able to describe her assailant as a "Hispanic or Asian" male dressed in camouflage and wearing a hat. Ultimately, Linda survived the attack.

The police provided Linda's description of her assailant to the news media, hoping that someone might come forward with useful information. Within hours, a local gardener told the police that Appellant, a Filipino high-school student whom he had previously seen in the Shaars' neighborhood, fit the description that Linda had given. A classmate of Appellant's informed the police that, around the time of the offense, he had seen Appellant wearing a camouflage-style hat in a park near the Shaars' house. The classmate did not know Appellant's name, but he was able to identify Appellant in their school's yearbook.

The police learned that Appellant was the adopted son of Wesley ("Wes") and Karen Hall. In the early morning hours of October 21, 2011, the police went to the Hall residence, just five blocks from the crime scene, to speak with Appellant. When the police arrived and asked to speak with Appellant, Appellant's sister answered the door and told them that her parents were not home, but she was able to reach Wes, a local attorney, on his cellular phone. With Wes listening on speakerphone and Appellant standing just outside the house, a police detective asked Appellant where he had been at the time of the crime. Appellant replied that he had been "in the park jogging." The

detective asked to see the clothes that Appellant wore while jogging. Appellant produced some freshly washed clothes that did not match the witnesses' description of the assailant's clothing. The police left without arresting Appellant.

Later that day, Wes and Karen brought Appellant to the police station so that Appellant could give a voluntary statement. Appellant agreed to let the police collect his fingerprints. However, police discovered that Appellant had a superglue-like film on his fingertips, preventing them from collecting useful fingerprints. Appellant attributed the film to "a skin condition," but the film came off when an officer wiped Appellant's fingertips with alcohol, and police were able to obtain his fingerprints.

Appellant began speaking with homicide detectives about Ed's murder; Wes asked the detectives to read Appellant his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). While Wes was still in the interview room, Appellant denied murdering Ed or attacking Linda. Eventually, one of the detectives asked Appellant if he would feel more comfortable speaking with them if Wes stepped out of the room. Appellant said that he would. Wes agreed to step out.

Appellant then admitted that he was the person who had murdered Ed and assaulted Linda. The Shaars were strangers to Appellant—he attacked them simply because he "want[ed] to kill," and the Shaars presented "a suitable target." Appellant told the detectives that he had "enjoyed" killing Ed, at one point claiming to have had a "little smile on [his] face" as he did so. Appellant said that he "did not feel any emotion" when he shot Ed in the head and that Linda's pleas for Appellant to spare her life "did not concern" him. At various points, Appellant claimed to have planned the attack for

anywhere from six months to a year and a half. One of the detectives testified that, during this confession, Appellant appeared "happy" to describe what he had done.

Appellant told the detectives that he put the murder weapons and clothes he wore that day into a bag and threw the bag into a pond near the Shaars' house. Investigators were unable to find the bag after draining and searching the pond. Appellant eventually admitted that he had hidden the weapons and clothing in the garage attic of another house the Halls owned. When the police searched the attic, they found what one police witness would later describe as a "go bag"—a bag containing "[e]verything you might need for a rapid response to some sort of violent situation." Among other things, this bag contained: (1) a handgun later linked by forensic testing to ballistic evidence recovered at the crime scene; (2) two knives later shown by DNA testing to have Ed's and Linda's DNA profiles on them; (3) jeans and a long-sleeved shirt, both stained with what was later confirmed to be Ed's blood; and (4) a camouflage-style "jungle hat" later shown to have Ed's DNA on the outside and Appellant's DNA on the sweatband. There was also evidence of a homemade bomb in Appellant's "go bag."

Presented with the foregoing evidence, a Brazos County jury found Appellant guilty of capital murder.

**B. Punishment Phase Evidence**

In the punishment phase, the State elicited testimony about the brutality of the charged offense and the extent of Linda's injuries. The State established that, during a warrant-supported search of Appellant's room, police investigators found various cutting instruments (such as a knife, a machete, and a hacksaw) and drawings of knives. They

also found a book about serial killers and some of Appellant's handwritten notes. The notes included a list of names that the State characterized as a "hit list"—a list of people whom Appellant intended to kill.

In addition, the State presented evidence of Appellant's behavior in the Brazos County Detention Center while he was awaiting trial. Jail officials testified that, during a February 2013 search of Appellant's cell, they found a shank hidden in Appellant's mattress and two unauthorized razor blades wedged in the binding of a legal pad. A May 2013 search of Appellant's cell uncovered more unauthorized razor blades hidden under a corner of Appellant's bunk.

Four current or former Brazos County Detention Center inmates testified to statements that Appellant allegedly made while he was awaiting trial. One inmate testified that, when Appellant described his attack on the Shaars, the inmate could hear "arousal" in Appellant's voice. This inmate also claimed that Appellant said that his attack on the Shaars was simply "practice for his foster parents . . . [b]ecause he was plotting to murder his foster parents." Another inmate attributed to Appellant the statement that he would "fucking kill someone" if he was sentenced to life in prison. When this inmate asked Appellant who he intended to kill, Appellant responded, "That old man that's snoring underneath me, Bones." A third inmate testified that he overheard Appellant telling someone that he was going to "kill one of these guards" if he was convicted. A fourth inmate testified that Appellant claimed to have intentionally dulled the knife he used to attack the Shaars so that they would feel even more pain.

The State also presented the jury with video footage showing Appellant interacting with Comedy Central comedian Jeff Ross in February 2015. Ross was at the detention center filming content for a television show. In the video, Ross, Appellant, and other inmates can be seen and heard bantering about life in jail, Appellant's appearance and demeanor, and the death penalty and criminality in general.

Appellant's punishment phase case was multifaceted. He presented testimony and evidence from multiple witnesses about the squalid and impoverished conditions of his early life in the Philippines and background information about his adoption and relocation to the United States. He elicited testimony from a few of his high school teachers and classmates that they perceived Appellant as a demure and polite but socially awkward young man. Appellant depicted life in the Hall household as being marked by constant beratement and psychological abuse, mostly coming from his adoptive mother, Karen.

Another theme of Appellant's punishment phase case was that Appellant was not a future danger because he was a slightly built person with no other history of violence or criminal behavior. Jail guards who supervised Appellant at the detention center testified that Appellant was generally well behaved. Appellant presented evidence that, while he was awaiting trial, he had earned an Official Certificate of High School Equivalency. A former Texas prison administrator described the policies that Texas prisons have in place for minimizing the risk of inmate violence.

Appellant presented extensive mental health testimony. A neuropsychologist who administered a series of psychological tests to Appellant testified that she noticed

"indications of . . . subtle organic . . . brain dysfunction" in Appellant's test results. Although this expert declined to diagnose Appellant with a mental illness, she said that, based on the test results, she could not rule out diagnoses of schizophrenia, post-traumatic stress disorder (PTSD), dissociative identity disorder, and depression. Another expert, a psychologist, described the toll that traumatic events in Appellant's life had likely taken on his development. Yet another psychologist opined that Appellant suffered from dissociative identity disorder, PTSD, and major depression. A psychiatrist testified that Appellant suffered from "a neurodevelopmental disorder," likely because of prenatal exposure to alcohol and drugs, and that Appellant suffered from "a dissociative disorder," PTSD, and "a depressive disorder." He also testified that, based on his review of imaging done on Appellant's brain, there was a "discrete area of harm, of lesser functioning" in Appellant's brain suggestive of "traumatic brain injury."

In rebuttal, the State called two forensic psychologists to undermine the defense's suggestion that Appellant was severely mentally ill. One testified that Appellant's neuropsychological test results did not "suggest or support neuropsychological impairment that we would see after a traumatic brain injury." The other testified that, based on his review of the relevant data, he "did not find any serious mental disease or defect," and he specifically disputed the defense experts' diagnoses of PTSD, dissociative identity disorder, and major depressive order. He also said that he found no evidence in the relevant data that Appellant's biological mother had consumed alcohol or drugs while she was pregnant with Appellant.

Ultimately, the jury found by its answers to the statutory special issues that: (1) beyond a reasonable doubt, there was a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society; and (2) there were insufficient mitigating circumstances to warrant a sentence other than death. *See* Art. 37.071, §§ 2(b)(1), (e)(1). Based on the jury's answers to these issues, the trial court sentenced Appellant to death.

## II.     EVIDENCE OF FUTURE DANGEROUSNESS

In point of error seven, Appellant contends that the evidence was legally insufficient to support the jury's finding that there is a probability that he would commit criminal acts of violence constituting a continuing threat to society. *See* Art. 37.071, § 2(b)(1).

A jury may consider a variety of factors in determining whether a defendant will pose a continuing threat to society. *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010). Those factors include but are not limited to:

> (1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the crime; (7) psychiatric evidence; and (8) character evidence.

*Id.* at n.4 (quoting *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987)). In determining whether there was sufficient evidence to support the jury's verdict on the future-dangerousness special issue, we consider all the evidence at the jury's disposal,

including evidence adduced at the guilt phase of trial, and view it "in the light most favorable to the jury's finding." *Id.* at 730. Then, with the factors listed above and any other relevant considerations in mind, we determine whether "a rational jury could have found beyond a reasonable doubt that the answer to the future-dangerousness issue was 'yes.'" *Id.*

In this case, viewed in the light most favorable to the jury's verdict, the facts of the underlying capital murder support the jury's determination that Appellant represents a continuing threat to society. *See, e.g.*, *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995) ("[T]he circumstances of the offense and the facts surrounding it may furnish . . . probative evidence . . . regarding the probability of future acts of violence."). By his own admission, Appellant brutally stabbed then shot a complete stranger to death, not out of self-defense or because he was under any form of duress, but simply because he wanted to. *See Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011) (juries may consider "the calculated nature of the defendant's acts"); *King v. State*, 953 S.W.2d 266, 272 (Tex. Crim. App. 1997) ("Murder by its very nature is brutal, but we have recognized that a stabbing death is particularly brutal."). Further, in the same transaction in which Appellant murdered a particularly vulnerable citizen, he attempted to murder another such person, this one a wheelchair-bound woman, by slashing her throat. *See Williams v. State*, 270 S.W.3d 112, 138 (Tex. Crim. App. 2008) (reasoning that evidence that the appellant had "broke[n] into the home of and viciously attacked and murdered" an elderly woman supported a finding of future dangerousness). There was evidence that Appellant planned this offense for months and took steps to avoid getting caught. *See*

*Sonnier*, 913 S.W.2d at 517 ("[E]vidence of a murder committed with calculation, deliberation, or premeditation is evidence of future dangerousness.").

Fellow jail inmates testified that Appellant made statements to them indicating a lack of remorse for his attack on the Shaars. *See Heiselbetz v. State*, 906 S.W.2d 500, 507 (Tex. Crim. App. 1995) (reasoning that evidence of "callousness and lack of remorse" can support a finding of future dangerousness). The same sources testified that Appellant had expressed a willingness to kill again, with one of his potential victims being an elderly inmate, the other being a guard. Appellant suggests that this jailhouse witness testimony was inherently unreliable. *See infra* Points of Error 4, 5. But, in the punishment phase, the credibility and weight to assign to that testimony was the jury's decision to make, and we cannot say that any rational factfinder would have rejected it out of hand. *See Sonnier*, 913 S.W.2d at 517 ("[T]he weight given to particular evidence is within an individual juror's prerogative and not an appropriate consideration in reviewing the sufficiency of evidence [to support a finding of future dangerousness].").
Even without that testimony, the jury could rationally consider Appellant's possession of razors and a shank while incarcerated to be indicative of future dangerousness. *See Alvarado v. State*, 912 S.W.2d 199, 209 (Tex. Crim. App. 1995) ("[P]ossession of weapons while incarcerated . . . constitute[s] evidence of future dangerousness.").

Appellant, citing our opinion in *Berry v. State*, argues that the proper inquiry is whether the evidence proves beyond a reasonable doubt that he would pose a continuing danger "in the actual circumstances in which [he] would be living"—i.e., prison. *See Berry v. State*, 233 S.W.3d 847, 863 (Tex. Crim. App. 2007). In so doing, Appellant

mischaracterizes the future-dangerousness special issue. "We have rejected such a reading of *Berry* as being inconsistent with prior case law construing the future dangerousness special issue to ask . . . whether a capital defendant would be dangerous *whether in or out of prison*." *Lucio v. State*, 351 S.W.3d 878, 903 (Tex. Crim. App. 2011) (emphasis added) (internal quotation marks omitted) (quoting *Martinez*, 327 S.W.3d at 735). With this proper inquiry in mind, and viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that a rational jury could have answered the future-dangerousness special issue in the affirmative. Point of error seven is overruled.

### III.    THE COMEDY CENTRAL VIDEO

In points of error one, two, and three, Appellant argues that the trial court erred to admit in the punishment phase of trial a video recording in which Comedy Central comedian Jeff Ross is shown joking around with several inmates, including Appellant, in the Brazos County Detention Center.

In early 2015, a producer for the cable television network Comedy Central contacted the American Jail Association and asked whether there were any jails that would be interested in allowing comedian Jeff Ross to film a comedy special in their facilities. When this inquiry was forwarded to member jails, the Brazos County Detention Center, where Appellant was being held while awaiting trial, informed the producer that it would be interested in hosting the special. One Brazos County Detention Center official testified that the jail's interest in hosting the special was due to its adherence to a school of thought called "Inmate Behavior Management." Pursuant to that

school of thought, the jail strove to offer incentives for "positive behavior and . . . productive activities."

In February 2015, Brazos County entered into a written agreement with Comedy Central in which Brazos County gave Comedy Central permission to film a comedy special inside the Brazos County Detention Center. Comedy Central agreed to compensate Brazos County for "additional staffing money and extraordinary expenses" related to the filming, but it did not otherwise agree to pay the county for the right to film inside the jail. The written agreement authorized Comedy Central to "photograph or record any inmate in the jail" who had signed a release form. The jail posted flyers throughout its facilities advertising the show.

Ross and his crew filmed the special over the course of three days in late February 2015. For security purposes, they were accompanied by the jail's quartermaster. As relevant to these points of error, on February 26, 2015, Ross and his crew entered one of the jail's housing pods and mingled with the inmates. Eventually, they approached a table where Appellant and some other inmates were sitting. Ross sat with the inmates and proceeded to have a wide-ranging conversation with them. This conversation lasted over seventeen minutes and was captured on video.[2] As detailed below, during this conversation, Ross repeatedly mocked Appellant's appearance and made crass jokes

---

[2] Appellant signed a release form on February 26, 2015—the same day that he was filmed speaking with Ross. On appeal, Appellant suggests that he did not sign the release form until after he spoke with Ross. The State disputes this suggestion. Appellant does not allege any error arising from the timing of his release-form signature, and our resolutions of points of error one, two, and three do not depend on that timing.

about his race. Appellant, meanwhile, made comments arguably evincing a lack of remorse for having committed capital murder.

When the jail's administrator learned that Ross had interacted with Appellant and filmed the ensuing conversation, he contacted Comedy Central to request "that any recording of any interaction with Mr. Hall be omitted from use in any future manner." He stated that Appellant's case was "high-profile" and expressed a concern that "any use of this material could have an adverse impact on the criminal proceedings." The administrator asked Comedy Central to furnish a digital copy of the conversation so that "both the District Attorney and Mr. Hall's Defense Attorney" could "make an independent determination" as to whether "the discussion has an impact on the criminal proceedings." A few weeks later, the State subpoenaed the footage and Comedy Central provided the State with an unedited copy. The State notified Appellant that it intended to offer the unedited video as punishment phase evidence at Appellant's trial.

Appellant filed a motion to suppress the video. He argued that, whether intentionally or not, the State had created a situation in which one of its de facto agents (Ross) was able to gather evidence against Appellant by speaking with him, post-indictment, without his lawyer being present. Appellant presented evidence that, in November 2011, his lawyers had sent a "no contact" letter to the Brazos County Detention Center, directing the jail to "make no further contact . . . with [Appellant]" without counsel's "express written approval." At a hearing on Appellant's motion, Appellant called the jail's administrator as a witness and questioned him as to why he had requested a copy of the footage. In giving his explanation, the administrator denied that

he had requested the footage with the conscious objective of obtaining evidence against Appellant. After considering arguments for and against Appellant's motion to suppress, the trial court denied it, expressly finding that: (1) there was no agreement between Ross and the State for Ross to gather incriminating evidence; and (2) the reason the jail administrator had requested a copy of the video was "to keep from disrupting the trial and delaying the trial"—not "for purposes of gathering evidence."

Appellant later lodged several relevance and Rule 403 based objections to the video, both in its entirety and as to certain specific statements contained therein. As a result of those objections, the trial court ordered extensive redactions. The redacted video (hereinafter "Comedy Central video") was admitted in the punishment phase of Appellant's trial and was just under nine minutes long.

## A. Right to Counsel

In point of error one, Appellant argues that the State circumvented Appellant's Sixth Amendment right to counsel when the State, pursuant to a written agreement, allowed Ross to enter the Brazos County Detention Center and elicit incriminating statements from Appellant without his counsel being present.

In *Massiah v. United States*, 377 U.S. 201, 206 (1964), the Supreme Court held that the Sixth Amendment prohibits the government from using a defendant's "own incriminating words" against him in a criminal proceeding if the government or one of its agents "deliberately elicited" the incriminating statement without the defendant's counsel being present. We have described the *Massiah* inquiry as being "whether, after the Sixth Amendment right to counsel has attached, the government . . . knowingly circumvented

the defendant's right to counsel by using an undisclosed government agent to deliberately elicit incriminating information." *Rubalcado v. State*, 424 S.W.3d 560, 570 (Tex. Crim. App. 2014). *Massiah* thus applies "only if the person who elicited statements from the defendant was a government agent." *Id.* at 575.

Neither this Court nor the Supreme Court has ever articulated a comprehensive test for determining "what makes an individual a government agent for *Massiah* purposes." *See id.* at 575–76. However, having previously surveyed the approaches of various jurisdictions in making that determination, we have discerned "at least one common principle: to qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official." *Manns v. State*, 122 S.W.3d 171, 183–84 (Tex. Crim. App. 2003). The agreement or instruction need not necessarily involve a quid pro quo; it may be enough for the State to make a "conscious decision to obtain the informant's cooperation" and for the informant to "consciously decide[] to provide that cooperation." *See Rubalcado*, 424 S.W.3d at 575–76 (some brackets omitted). But if there was neither an agreement nor an instruction from the government for the informant to obtain incriminating information, there was no agency relationship for *Massiah* purposes. In reviewing a trial court's resolution of this issue, an appellate court should afford "almost total deference" to the trial court's determination of historical facts and mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Manns*, 122 S.W.3d at 178 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

In this case, the trial court expressly found that there was no agreement between Ross and the State for Ross "to gather evidence." Further, there is no evidence that the State instructed or "encouraged" Ross to elicit incriminating information from any of the inmates in the Brazos County Detention Center. *Cf. Rubalcado*, 424 S.W.3d at 576; *State v. Hernandez*, 842 S.W.2d 306, 316 (Tex. App.—San Antonio 1992, pet. ref'd) (finding no agency relationship between a news reporter who elicited incriminating statements from the defendant in a phone interview and the jailer who facilitated the phone interview because the reporter "was clearly acting on his own in eliciting statements from the appellee"). Viewing the record with "the proper deference to the trial court's ruling," *see Manns*, 122 S.W.3d at 189, we conclude that Ross was not acting as an agent of the State when he spoke with Appellant at the Brazos County Detention Center.

Appellant responds that the lack of an express agreement between Ross and the State for Ross to elicit incriminating is not dispositive because, as he puts it, "a *Massiah* violation can occur even where the State specifically instructs its informant not to initiate any conversation with or question a defendant regarding the offense." Thus, Appellant concludes, *Massiah* is implicated whenever the State knowingly "orchestrate[s] a situation in which it was reasonably likely that the defendant . . . would make incriminating statements in the absence of counsel" because "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

Appellant's premise is correct. *Massiah* violations can occur even when the government specifically instructs its informant not to broach a specific criminal offense in any conversation with the accused. In *United States v. Henry*, the Supreme Court found a *Massiah* violation where the federal government told a jailhouse informant to "be alert to any statements made by the federal prisoners" but specifically instructed the informant "not to initiate any conversation with" the defendant regarding the offense in question. *United States v. Henry*, 447 U.S. 264, 266 (1980).

But Appellant's conclusion does not follow. *Henry* does not undermine our understanding that an agreement (or at least an instruction) to gather incriminating evidence is an essential element of *Massiah*'s governmental agency requirement. First, we discussed *Henry* and its facts in the very case in which we first recognized that requirement. *See Manns*, 122 S.W.3d at 178–79 (discussing *Henry*). Second, we have suggested that *Henry* was focused upon the "deliberate elicitation" prong of a *Massiah* claim—not the agency prong. *See id.* at 179. Our precedent identifying this element of *Massiah* agency (i.e., that there must be either an agreement or an instruction to gather evidence) is not in tension with *Henry*'s expansive view of deliberate elicitation.

Based on the trial court's record-supported finding that there was no "agreement between the State and Jeff Ross" for Ross "to gather evidence," as well as our own independent review of the record, we conclude that Ross was not acting as an agent of the State when he spoke with Appellant. That being the case, the manner in which the Comedy Central video originated does not implicate *Massiah*. The trial court did not err

to deny Appellant's motion to suppress the Comedy Central video on Sixth Amendment grounds.  Point of error one is overruled.

### B.  Rules of Evidence 401, 402, and 403 [3]

In point of error two, Appellant argues that even if the Comedy Central video was not subject to suppression on Sixth Amendment grounds, its contents were not relevant to the issues facing the jury at the punishment stage.  *See* TEX. R. EVID. 401, 402.  Alternatively, Appellant argues that any slight relevance the video might have had was substantially outweighed by its capacity for unfair prejudice, confusing the issues, and misleading the jury.  *See id.* 403.  Appellant thus contends that the trial court erred to overrule his relevance and Rule 403 based objections to the Comedy Central video.

Under Rule 401, evidence is relevant if it has any tendency to make a "fact . . . of consequence in determining the action" more or less probable than it would be without the evidence.  Evidence does not need to prove or disprove a particular fact by itself to be relevant under this rule; it is sufficient if the evidence provides even a small nudge toward proving or disproving a fact of consequence.  *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018).  But, if the evidence fails to meet this threshold standard, it is inadmissible.  *See* TEX. R. EVID. 402.  A trial court's ruling excluding evidence will be upheld on appeal unless the trial court abused its discretion, *Montgomery v. State*, 810

---

[3]  Because this point of error makes two arguments for inadmissibility, grounded in distinct rules of evidence, it is multifarious.  *See* TEX. R. APP. P. 38.1.  However, in the interest of justice, we will address both of Appellant's arguments.

S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g), and a trial court abuses its discretion only when its ruling is not within "the zone of reasonable disagreement." *Id.*

At trial, Appellant lodged relevancy and Rule 403 objections to specific statements within the video and to the video as a whole. In this point of error, Appellant no longer argues that specific parts of the video were inadmissible, nor does he segregate the allegedly inadmissible statements from the admissible statements. *See Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002). Therefore, Appellant has forfeited that argument. Appellant now argues only that the entire Comedy Central video lacks any relevance to the statutory special issues because (1) most of the statements that it contains were made by people other than Appellant, and (2) its "essential context" as an entertainment product makes it impossible for a factfinder to draw any meaningful inferences from the few statements Appellant did make.

Our independent review of the Comedy Central video reveals at least three statements made by Appellant that have some relevance to the punishment-phase special issues. First, during a conversation about the death penalty in Texas, Appellant makes a comment that could lead a rational factfinder to conclude that Appellant viewed his crime as a "petty" act:

| ROSS: | They have the death penalty in Texas. This is a scary state. |
|---|---|
| OTHER INMATE: | Yeah. |
| APPELLANT: | Yeah. |
| OTHER INMATE: | They're not bashful about giving it out, either. |

| | |
|---|---|
| APPELLANT: | Yeah, they'll, uh, they'll hang you for the, they'll hang you for—well, they, they'll basically, screw you over, over the most, uh, petty shit, so.[4] |

Later, Appellant makes a joke that a rational factfinder could interpret as Appellant

making light of his crime:

| | |
|---|---|
| ROSS: | . . . What are you in here for? |
| APPELLANT: | Ah . . . |
| ROSS: | Hacking somebody's computer? |
| APPELLANT: | Something like that, yes. |
| OTHER INMATE: | "Hacking" being the operative word. |
| APPELLANT: | Yeah.  Yeah, used a machete on someone's screen, so. |

Finally, shortly after this exchange, Appellant displays what a rational factfinder could

construe as a disregard for human life:

| | |
|---|---|
| ROSS: | He [pointing at Appellant] seems like a [expletive] scary dude, I don't know what it is, man. |
| APPELLANT: | Oh come on, I wouldn't hurt a fly. |
| ROSS: | What's that? |
| APPELLANT: | I wouldn't hurt a fly. |

---

[4]  Before trial, the State prepared and offered what it conceded was a "rough" transcript of the unedited video.  The trial court admitted this transcript solely for the purpose of litigating Appellant's motion to suppress and evidentiary objections.  The quotations of the Comedy Central video in our handling of this point of error are based on our own independent review of the video—not the rough pretrial transcription.

ROSS:       Really?  What about a human?

APPELLANT:    Eh, they're annoying.  We'll leave 'em to their
            own devices, so.

A rational factfinder could have found Appellant's comments to be relevant to the future-dangerousness special issue.  *See Ford v. State*, 919 S.W.2d 107, 112 (Tex. Crim. App. 1996) ("Remorselessness and disregard for human life have been considered in determining the sufficiency of the evidence to support a jury finding of [future dangerousness].").

Appellant argues that, given the context in which he uttered these statements (i.e., "in a highly artificial interaction, staged for entertainment purposes, [and] in response to calculated provocation and encouragement"), no reasonable person would rely on them to change his or her belief in the likelihood of a consequential fact.  We disagree.  A rational factfinder viewing the Comedy Central video could conclude that Appellant appears relatively relaxed and unguarded throughout—and that Appellant's interactions with Ross and the other inmates thus reflected his honest opinions.  Furthermore, the jurors were aware of the context in which Appellant made his remarks.  Appellant's argument that the Comedy Central video was wholly irrelevant to the punishment-phase special issues is without merit.

Of course, the Comedy Central video contains much more than just the statements from Appellant outlined above.  It contains statements from Appellant that are less obviously relevant to the statutory special issues (e.g., the jury was permitted to watch a portion of the video in which Appellant tells Ross a bizarre story about how he once wore

a cowboy hat to school). And it contains statements from Ross and other inmates that were neither directed at Appellant nor made in response to something Appellant said (e.g., at one point, Ross, speaking to no one in particular, opines that jail is "like . . . summer camp. You get to hang out, have some laughs, talk about [sex]"). In addition to arguing that the Comedy Central video was wholly irrelevant, Appellant argues that its irrelevant and inflammatory portions so outweighed its few relevant portions that the trial court should have excluded the entire exhibit under Rule 403.

Under Rule 403, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." When undertaking a Rule 403 analysis, a trial court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). As with Rule 401, a trial court's decision to admit evidence over a Rule 403 objection is reviewed for an abuse of discretion. *Montgomery*, 810 S.W.2d at 391 (op. on reh'g).

Here again we note that Appellant does not argue that any discrete statement or set of statements within the Comedy Central video should have been excised from the video under a Rule 403 balancing test. Instead, he argues that, when certain inflammatory

statements are included in the balance, a rational observer could only conclude that the video's probative value was substantially outweighed by the dangers it posed of "unfair prejudice, confusing the issues, and misleading the jury." Consequently, we must determine whether the video's cumulative probative value was so clearly outweighed by its capacity for misuse that the trial court's decision to admit the video constituted an abuse of discretion.

We begin with the first two factors: (1) the inherent probative force of the Comedy Central video and (2) the State's need for it. *See Gigliobianco*, 210 S.W.3d at 641. Appellant contends that because the Comedy Central video was made by a professional comedian, purely for entertainment purposes, its probative value was slight. We disagree. While a rational factfinder could regard the video's origin and purpose as reasons to afford it little probative weight, our review of the video does not lead us to conclude that one would be bound to do so. Within the zone of reasonable disagreement, the trial court could conclude that Appellant's relaxed attitude around Ross signified a willingness to be honest with him. Further, the court could reasonably conclude that, when his guard was down, Appellant characterized his crime as a "petty" thing, on par with damaging someone's computer. The trial court could thus rationally regard the video as uniquely and powerfully probative of Appellant's character and perception of the underlying capital murder. *See* Article 37.071, § 2(a)(1) (stating that a trial court in a capital proceeding may deem the defendant's character "relevant to sentence"); *Heiselbetz*, 906 S.W.2d at 507 (observing that remorselessness can contribute to the reasonableness of a jury's conclusion that a person is a "continuing danger"). Further,

within the zone of reasonable disagreement, the trial court could conclude that the jury had no other way to observe Appellant's unguarded demeanor in a confined setting. The trial court could also rationally conclude that the uniqueness of this glimpse into Appellant's character and thoughts greatly increased the State's need for it. We find that each of these factors weighs in favor of admission.

We proceed to consider the next three factors in the Rule 403 analysis: (3) the video's tendency to suggest a decision on an improper basis; (4) the video's tendency to confuse or distract the jury from the main issues; and (5) the video's tendency to be given undue weight by the jury. *See Gigliobianco*, 210 S.W.3d at 641. Appellant argues that these factors weigh in favor of exclusion for several reasons. First, the video contains a number of Ross's own unsolicited opinions about Appellant's appearance and demeanor. For instance, at various points in the video, Ross mocks Appellant's haircut, criticizes Appellant for appearing humorless, and opines that Appellant "seems like a [expletive] scary dude." Second, several of Ross's comments denigrated Appellant's race. For instance, at one point, Ross refers to Appellant as "Slim Sushi"; at another point, he compares Appellant to one of the characters from the film "Harold and Kumar." Third, according to Appellant, the video shows Ross making "hostile and dehumanizing statements about inmates and confinement generally." In addition to the "summer camp" exchange outlined above, Appellant points to an exchange in which Ross suggests that inmates tell so many lies that "they don't know the difference [between lies and truth] anymore." Finally, the video contains statements from other inmates that Appellant neither prompted nor voiced his support for. Appellant specifically directs our attention

to a portion of the video in which an inmate claims that he copes with the more disagreeable aspects of jail life by remaining "heavily medicated."

Many of Ross's comments are disconcerting and pose the very risks that Rule 403 was designed to minimize. Even so, we cannot say that the trial court's evaluation of this evidence was outside the zone of reasonable disagreement.

As for the various statements that other inmates made, the trial court could rationally conclude that, precisely because Appellant was not the one making them, there was no great risk that the jury would unfairly attribute any of the sentiments expressed therein to Appellant. Appellant openly agreed with some of the other inmates' opinions by saying "yeah," laughing, or nodding along. Other times, Appellant did not indicate agreement with something another inmate said. Because the jury was capable of discerning for itself which statements Appellant signaled some level of agreement with, the trial court could rationally conclude that the video's inclusion of statements from other inmates did not render it intolerably susceptible to misuse under the third, fourth, and fifth Rule 403 factors.

That leaves only the final Rule 403 factor for us to consider: (6) the time needed to develop and present the video and the likelihood that the video would "merely repeat evidence already admitted." *See id.* at 641–42. As we have already observed, the trial court could rationally conclude that this evidence provided a unique glimpse into Appellant's unguarded demeanor in a confined setting and that the risk it would "merely repeat evidence already admitted" was therefore nonexistent. Furthermore, the admitted video was just under nine minutes long, and once its admissibility had been fully

litigated, the State needed to call only a single witness to lay the foundation for it. We conclude that this factor weighs in favor of admission.

Balancing these factors, and bearing in mind that Rule 403 favors the admission of relevant evidence over its exclusion, *see Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006), we cannot say that the trial court abused its discretion in admitting the Comedy Central video over Appellant's Rule 403 objection. The trial court's ruling that the video's overall probative value was not substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury was within the zone of reasonable disagreement. *See* TEX. R. EVID. 403. Appellant's argument that the Comedy Central video should have been excluded under Rule 403 is without merit. Point of error two is overruled.

## C. Eighth Amendment and Due Process

In point of error three, Appellant argues that the trial court's admission of the Comedy Central video rendered the sentencing proceeding inherently unreliable in violation of the Eighth Amendment, *see Gardner v. Florida*, 430 U.S. 349, 364 (1977) (White, J., concurring), and "fundamentally unfair" in violation of due process. He also argues that the video was demeaning of his "common human dignity," in violation of the Eighth Amendment. *See Furman v. Georgia*, 408 U.S. 238, 273 (1972) (Brennan, J., concurring).

To the extent that Appellant claims that admitting the Comedy Central video rendered the sentencing proceeding inherently unreliable, his claim is inadequately briefed. *See* TEX. R. APP. P. 38.1(i). Appellant cites *Monge v. California*, a noncapital

case, for the proposition that capital proceedings must "be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Monge v. California*, 524 U.S. 721, 732 (1998). He cites *Gardner*, a capital case, for the proposition that "any decision to impose the death sentence [must] be, and appear to be, based on reason rather than caprice or emotion." *Gardner*, 430 U.S. at 358. But he does not explain how the trial court's decision to admit the Comedy Central video was contrary to either of these propositions. Nor does he otherwise cite any precedent to support his assertion that admitting the video frustrated the Eighth Amendment's heightened reliability requirement. *See, e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality op.). Any attempt on our part to gauge the video's propriety under that requirement would inevitably entail our making Appellant's argument for him. We decline to do so.

To the extent that Appellant asserts that the trial court's decision to admit this video "abridged the guarantee of fundamental fairness promised by the due process clause," his claim is likewise inadequately briefed. *See* TEX. R. APP. P. 38.1(i). Appellant does not cite any legal authority in support of this contention. We will not make Appellant's argument for him.

Finally, to the extent that Appellant claims that the trial court's ruling offended the Eighth Amendment because "there is a terrible lack of dignity inherent in letting the Comedy Central video play any role in determining Appellant's fate," Appellant failed to preserve this claim for appellate review. *See Darcy v. State*, 488 S.W.3d 325, 329 (Tex. Crim. App. 2016) (explaining that "we have generally treated errors in the admission of

evidence as being subject to procedural default, regardless of the constitutional right involved"). At trial, Appellant objected on the ground that admitting the video would "render[] the sentencing proceeding unreliable under the Eighth Amendment." He did not object on the ground that the video denigrated his basic human dignity. *See* TEX. R. APP. P. 33.1(a)(1)(A). Point of error three is overruled.

## IV. JAILHOUSE WITNESS CORROBORATION

In points of error four and five, Appellant argues that the trial court erred by refusing to include in its punishment phase charge an instruction requiring the corroboration of jailhouse witness testimony. In point of error four, Appellant cites Article 38.075. In point of error five, Appellant invokes the Eighth Amendment principle that in capital cases there is a heightened need for reliability in the determination that death is the appropriate punishment. *See, e.g.*, *Woodson*, 482 U.S. at 305; *see also* *Morris v. State*, 940 S.W.3d 610, 615 (Tex. Crim. App. 1996).

At the trial's punishment phase, the State elicited testimony from four witnesses who were incarcerated in the Brazos County Detention Center for some of the time that Appellant was there awaiting trial. Those witnesses attributed statements to Appellant that the State would later use to argue that Appellant posed a continuing threat to society. During the punishment phase charge conference, Appellant asked the trial court to instruct the jury that "jailhouse snitch testimony . . . [is] to be corroborated by other evidence or else it's not to be considered." Although he did not specifically recite an article number, Appellant directed the court's attention to "a State statute in Texas . . . that talks about jailhouse snitch testimony." He also argued that "the Due Process Clause

and the 8th Amendment" required the trial court to give his requested instruction.  The

trial court denied Appellant's request.

**A.  Article 38.075**

Article 38.075(a) provides,

> A defendant may not be convicted of an offense on the testimony of a
> person to whom the defendant made a statement against the defendant's
> interest during a time when the person was imprisoned or confined in the
> same correctional facility as the defendant unless the testimony is
> corroborated by other evidence tending to connect the defendant with the
> offense committed.

Art. 38.075(a). Despite the phrase, "may not be convicted of an offense," Appellant

maintains that this statute applies even in the punishment phase of a criminal trial.  Citing

*Ex parte Evans*, Appellant notes that this Court has sometimes "construed the term

'conviction' to mean a judgment of guilt and the assessment of punishment," *Ex parte

Evans*, 964 S.W.2d 643, 647 (Tex. Crim. App. 1998), and he urges us to do so here.

We decline Appellant's request.  We have previously suggested that Article

38.075 was designed to operate "similarly" to Article 38.14, the statute "enacted to

address how to handle accomplice-witness testimony."  *See Phillips v. State*, 463 S.W.3d

59, 67 (Tex. Crim. App. 2015); *see also id.* at 69 (Keller, P.J., concurring) ("[T]he

jailhouse-witness statute was designed to operate like the accomplice-witness statute.");

*id.* at 70 (Newell, J., concurring) (endorsing Presiding Judge Keller's view of Article

38.075).  Several intermediate courts of appeals have reached a similar conclusion.  *See,

e.g.*, *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland 2012, pet. ref'd);

*Watkins v. State*, 333 S.W.3d 771, 778–79 (Tex. App.—Waco 2010, pet. ref'd).

Article 38.14 states that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." We have held that "evidence offered to prove the special issues of Art. 37.071 . . . is not included within the provisions of Art. 38.14." *May v. State*, 618 S.W.2d 333, 343 (Tex. Crim. App. 1981), *vacated on other grounds*, 454 U.S. 959 (1981); *see also Thompson v. State*, 691 S.W.2d 627, 633 (Tex. Crim. App. 1984). There is no meaningful textual distinction between the ways in which the terms "convicted" and "conviction" are used in Articles 38.075 and 38.14. *Compare* Art. 38.075(a) ("A defendant may not be convicted of an offense . . ."), *with* Art. 38.14 ("A conviction cannot be had upon . . ."). To the extent that there is a literal distinction between those uses, Article 38.075's phrasing, "convicted of an offense," is even more suggestive of a guilt-phase-only construction than Article 38.14's. *See Ex parte White*, 506 S.W.3d 39, 42–43 (Tex. Crim. App. 2016) ("[T]he word 'convicted' is more likely to refer solely to guilt than the word 'conviction' is."). We conclude that evidence offered to prove the special issues of Article 37.071 is not included within the provisions of Article 38.075. *Cf. May*, 618 S.W.2d at 343.

In light of this construction, the trial court in this case did not violate Article 38.075 by refusing to include a jailhouse witness corroboration instruction in its punishment phase charge. Point of error four is overruled.

**B. Eighth Amendment**

We have acknowledged that, "[b]ecause death is qualitatively different from any other punishment, the federal Constitution requires the highest degree of reliability in the

determination that it is the appropriate punishment." *Morris*, 940 S.W.2d at 615 (citing

*Woodson*, 428 U.S. at 305). We have also characterized jailhouse witness testimony as

"inherently unreliable." *Phillips*, 463 S.W.3d at 66. Appellant argues that, to reconcile

these holdings, we should hold that in death penalty cases the Eighth Amendment

requires a trial court to include a jailhouse witness corroboration instruction in its

punishment phase charge.

We disagree. Here again we find it useful to analogize between jailhouse witness

testimony and accomplice witness testimony. We have previously described accomplice

witness testimony as "inherently suspect," *see Jones v. State*, 982 S.W.2d 386, 389 n.5

(Tex. Crim. App. 1998), yet that description has never led us to conclude that the Eighth

Amendment requires an accomplice witness corroboration instruction in the punishment

phase of a capital trial, *see, e.g.*, *Thompson*, 691 at 634 (holding that "the accomplice

witness rule set out in Art. 38.14 . . . is not constitutionally mandated"). That is because,

in deciding whether to sentence a capital defendant to death, "[w]hat is important" is that

the jury be equipped to make "an individualized determination on the basis of the

character of the individual and the circumstances of the crime." *Tuilaepa v. California*,

512 U.S. 967, 972 (1994) (emphasis omitted). That requirement is met when the jury can

consider and give effect to "relevant mitigating evidence of the character and record of

the defendant and the circumstances of the crime." *See id.* And "[i]n no way" does the

absence of an accomplice witness corroboration instruction in the punishment phase of a

capital trial interfere with that requirement. *Thompson*, 691 S.W.2d at 634 (citing *Jurek*

*v. Texas*, 428 U.S. 262, 276 (1976)).

The same is true of jailhouse witness testimony. Allowing the jury to decide for itself the credibility and weight to give to jailhouse witness testimony, and the circumstances under which it is inclined do so, does not interfere with a capital defendant's right to present relevant evidence in opposition to the death penalty or the jury's ability to give effect to that evidence. *Cf. id.* That being the case, we do not understand the Eighth Amendment's heightened reliability requirement to necessitate a jailhouse witness corroboration instruction in the punishment phase of a capital trial. The trial court did not run afoul of the Eighth Amendment by refusing Appellant's requested instruction for the punishment phase charge. Point of error five is overruled.

## V. FUTURE DANGEROUSNESS SPECIAL ISSUE

In point of error six, Appellant argues that, insofar as the future-dangerousness special issue directs the jury to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," *see* Art. 37.071, § 2(b)(1), that issue "inevitably entail[s] a degree of speculation," *see Buck v. Davis*, 137 S. Ct. 759, 776 (2017), and therefore violates the Eighth Amendment's heightened standard for reliability in the determination that death is the appropriate punishment. *See Woodson*, 428 U.S. at 305. To support this claim, Appellant directs our attention to relatively recent law review articles and studies, the general thrust of which is that jurors cannot reliably determine whether a defendant convicted of capital murder will commit future acts of violence.

We are not persuaded. The future-dangerousness special issue does not ask jurors to determine whether a defendant *will* commit future acts of violence—it asks whether

there is a probability that a defendant *would* commit criminal acts of violence that would constitute a continuing threat to society. This distinction is meaningful. Focusing on the word "probability," we have described the future-dangerousness special issue as "essentially . . . normative" in character, as "the Legislature declined to specify a particular level of risk or probability of violence." *See Coble v. State*, 330 S.W.3d 253, 267–68 (Tex. Crim. App. 2010). The normative character of the future-dangerousness special issue means that concerns over its predictive accuracy "should be addressed to the Legislature" rather than this Court. *See id.* at 298 (some capitalization altered); *see also Chambers v. State*, 568 S.W.2d 313, 324 (Tex. Crim. App. 1978), *overruled on other grounds by Grijalva v. State*, 614 S.W.2d 420, 425 (Tex. Crim. App. 1980) ("Whether or not the concept of determining the probability of future conduct is mathematically viable, it is clear that the concept is viable in law.").

Appellant's argument thus relies on the same type of evidence that we have previously held to be irrelevant to the constitutionality of the future-dangerousness special issue. *See Coble*, 330 S.W.3d at 298. That being the case, we remain unpersuaded that the future-dangerousness special issue produces inherently unreliable death sentences in violation of the Eighth Amendment. *See id.* at 297–98; *McBride v. State*, 862 S.W.2d 600, 611 (Tex. Crim. App. 1993); *Joiner v. State*, 825 S.W.2d 701, 709 (Tex. Crim. App. 1992). Point of error six is overruled.

## VI. STATE'S CLOSING ARGUMENT

In points of error eight and nine, Appellant contends that the trial court erred to overrule his objection to part of the State's punishment phase closing argument. The

State argued to the jury that sentencing Appellant to life in prison would be effectively giving him "a free one" (which in context apparently meant a free pass) for capital murder. Counsel interjected, "I'm going to object to the use of 'free one.' Life without parole is not a free one." In point of error eight, Appellant contends that the State's argument exceeded the bounds of proper jury argument. *See, e.g.*, *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). In point of error nine, Appellant contends that the State's argument misled the jury about its obligation to fairly consider mitigating evidence in violation of the Eighth Amendment and Fourteenth Amendment.

A claim that a prosecutor's closing argument exceeded the bounds of proper jury argument is subject to procedural default. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). So is a claim that a prosecutor's closing argument violated the Eighth and Fourteenth Amendments. *See Banda v. State*, 890 S.W.2d 42, 61 (Tex. Crim. App. 1994). To preserve error on these kinds of claims, a defendant must make a timely objection stating the grounds for his desired ruling with sufficient specificity to make the trial court aware of the claim, unless the specific grounds were apparent from the context. *See* TEX. R. APP. P. 33.1(a)(1)(A). Magic words are not required, but the defendant must at least "let the trial judge know what he wants [and] why he thinks himself entitled to it," and he must "do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992).

In this case, counsel did not tell the trial court that she regarded the prosecutor's comment as outside the bounds of proper jury argument or violative of the Eighth or

Fourteenth Amendments. Furthermore, it was not reasonably apparent from the context that those were the legal bases of her disagreement with the State's argument. *See* TEX. R. APP. P. 33.1(a)(1)(A). The explanation that counsel gave for her objection—"[l]ife without parole is not a free one"—did not assert any legal right or invoke any recognized or proposed rule of trial procedure. On these facts, we conclude that Appellant has failed to preserve error. Points of error eight and nine are overruled.

## VII.   VOIR DIRE

### A. *Morgan v. Illinois*

In point of error ten, Appellant argues that the trial court denied him an opportunity for "meaningful voir dire" in violation of the Sixth, Eighth, and Fourteenth amendments to the United States Constitution. *See Morgan v. Illinois*, 504 U.S. 719, 733–34 (1992) (italics omitted). Specifically, Appellant complains about the trial court's refusal to allow him to ask each prospective juror whether he or she could consider "youth and mental illness to be evidence in mitigation."

At a motions hearing before individual voir dire, the State objected to a series of PowerPoint slides that Appellant intended to use as a visual aid when questioning the prospective jurors. In the slides at issue, Appellant asked the jurors to quantify their level of agreement with various age and mental health related propositions, such as: (1) "Age or youth is an important factor in determining the appropriate punishment for a crime"; and (2) "Poor mental health can reduce a person's moral blameworthiness." The State argued that these slides contained improper commitment questions because they invited the jurors to resolve the mitigation issue a certain way after learning a particular fact. *See*

*Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). Appellant responded that: (1) the Supreme Court has recognized youth and mental illness as per se mitigating circumstances; (2) these questions were designed to reveal those jurors who would refuse to treat youth and mental illness as mitigating circumstances; (3) the questions were therefore constitutionally mandated under *Morgan*; and (4) the United States Constitution trumps any state law procedural rule to the contrary. The trial court sustained the State's objections to Appellant's slides.[5] Several times throughout the remainder of individual voir dire, Appellant unsuccessfully attempted to ask certain jurors whether they could consider youth and/or mental illness as possible mitigating circumstances.

On appeal, Appellant reasserts the argument he made at trial: The Constitution affords a criminal defendant the right to be tried by jurors who will commit to at least "consider[ing]" youth and mental illness as potential sources of mitigation. If a juror flatly states that he or she would not regard those characteristics as even potentially mitigating, Appellant argues, the juror is subject to a *Morgan*-based challenge for cause. Appellant concludes that even if the questions he proposed at trial can be regarded as improper commitment questions under Texas law, their propriety under the United States Constitution immunized them from objection under state law.

---

[5] Based on the arguments before the trial court when it sustained the State's objections to Appellant's slides, the trial court's ruling could reasonably be regarded as a prospective prohibition on asking individual jurors whether they could consider youth and mental illness as mitigating circumstances. The State concedes that Appellant has preserved this claim of error as to at least one juror. We will assume without deciding that Appellant has preserved this point of error for appellate review.

Appellant is mistaken. "[T]he law does not require a juror to consider any particular piece of evidence as mitigating; all the law requires is that a defendant be allowed to present relevant mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating." *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998). Therefore, a trial court may lawfully refuse "to allow a defendant to ask venire members questions based on facts peculiar to the case on trial," including "questions about particular mitigating evidence." *Id. Morgan* did not hold otherwise. *Morgan* held that a criminal defendant has a constitutional right to challenge for cause any prospective juror who would automatically vote for the death penalty, *Morgan*, 504 U.S. at 729, and a concomitant right to questioning adequate to discover such jurors, *id.* at 733–34. Because *Morgan* does not require the juror commitment that Appellant envisions, the trial court did not abuse its discretion by prohibiting Appellant's proffered questions as improper commitment questions. *See Standefer*, 59 S.W.3d at 181 (holding that where the law does not require a given commitment from a juror, "a commitment question is invariably improper").

Appellant attempts to distinguish between questions "that seek[] to commit a juror to a particular sentencing vote" and those that simply "ask[] whether a juror will be able to fairly consider the aggravating and mitigating evidence in determining punishment." But Appellant's proffered questions went beyond asking the jurors whether they could consider all the evidence in determining the appropriate punishment. His questions introduced facts "peculiar to the case on trial," *see Raby*, 970 S.W.2d at 3, and sought to commit the jurors to treating those facts as mitigating.

Further, even questions that do not expressly "commit a juror to a particular sentencing vote" can constitute commitment questions. *See Standefer*, 59 S.W.3d at 180 ("[T]he word 'consider' does not prevent a question from being a commitment question."). Commitment questions are also those that "ask[] the prospective juror to set the hypothetical parameters for his decision-making." *Id.* In this case, the trial court would not have abused its discretion to conclude that Appellant's attempted inquiries into youth and mental illness sought to commit the jurors to a particular set of parameters in determining the appropriate punishment. Accordingly, the trial court did not err when it prevented Appellant from asking potential jurors whether they could consider youth and mental illness as possibly mitigating. Point of error ten is overruled.

## B. *Batson v. Kentucky*

In point of error thirteen, Appellant argues that the trial court erred to overrule his *Batson* objection to the State's use of a peremptory strike against Juror 89, a Hispanic woman. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986). This claim has both a procedural component, in which Appellant argues that the trial court failed to follow the established process for resolving a *Batson* claim, and a substantive component, in which Appellant argues that the trial court reached an incorrect bottom-line outcome in ruling on his *Batson* objection.

In a series of cases beginning with *Batson*, the Supreme Court established the following three-step process for adjudicating a claim that the prosecution exercised a peremptory strike against a juror because of the juror's race:

First, a defendant must make a prima facie showing that a peremptory

challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008) (internal quotation marks and brackets omitted). The third step is a pure credibility finding: the trial court must determine as a matter of fact whether the reasons the prosecution gave for its strike were mere pretexts for discrimination. *See Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) ("The term 'pretext' is solely a question of fact; there is no question of law."). For that reason, a trial court's ruling on a *Batson* objection must be affirmed unless it is "clearly erroneous." *Snyder*, 552 U.S. at 477.

In this case, in response to Appellant's *Batson* objection, and at the trial judge's instruction, the State offered several reasons for striking Juror 89. The State asserted that Juror 89: (1) had a college degree in psychology, a subject the State believed would be "a center focus of the Defense's case"; (2) indicated in her juror questionnaire that "some [offenders] with mental health issues . . . deserve punishment but not the death penalty"; (3) indicated in her juror questionnaire that life without parole would be the proper punishment in capital murder cases with "mental health concerns"; (4) had worked for Child Protective Services ("CPS"), which concerned the State because "part of the Defense's case . . . is going to be based on parental issues"; and (5) indicated in her juror questionnaire that she was "not sure about" the propriety of the death penalty for persons with mental illness. One of the prosecutors added that a former coworker of Juror 89s told him that Juror 89 would not be "a good juror in this case."

The trial judge ultimately overruled Appellant's *Batson* objection, stating, "That will be denied. I find there are race-neutral reasons for the strike." Appellant then objected to the State's strike under the Sixth, Eighth, and Fourteenth amendments to the United States Constitution, and the trial judge overruled this objection. Appellant further objected under Article I, Section 10 and Section 19 of the Texas Constitution, and the trial judge overruled this objection as well. Appellant asked the trial judge to make "specific findings of fact" relating to the "extrajudicial information" the prosecutor had provided about Juror 89's coworker. The trial judge responded: "I considered everything I heard. But . . . for the record, I find that there were sufficient reasons provided before that and would have ruled the same had it not been presented."

In the procedural component of this point of error, Appellant argues that the trial judge failed to undertake the third, credibility-based step of the *Batson* process. He points to the explanation the trial judge gave for his ruling—"I find there are race-neutral reasons for the strike"—as some evidence that the judge "failed to distinguish between *Batson*'s second step and its third." In essence, Appellant argues that the trial judge merely noted the facial race-neutrality of the State's proffered justifications (corresponding with the second step of the *Batson* process) and then scrutinized those justifications no further.

We do not agree with Appellant that the trial court failed to reach *Batson*'s third step. In *Blackman v. State*, we noted that the trial court's ruling, "The Court finds that the State offered race neutral reasons for exercising their strikes," could be viewed in context as "a determination with respect to the genuineness of the prosecutor's . . .

explanations." *Blackman v. State*, 414 S.W.3d 757, 769 (Tex. Crim. App. 2013). The same is true in this case. The trial court observed that "there [were] race-neutral reasons for the strike" in the context of providing Appellant with an adverse ruling on his objection to the State's strike, not just once, but thrice. Furthermore, in response to Appellant's request for detailed findings of fact, the trial court affirmed that it had "considered everything [it had] heard." Given this context, we view the trial court's comments as a third-step, credibility-based ruling on Appellant's *Batson* objection. The procedural component of Appellant's thirteenth point of error is without merit.

In the substantive component of his *Batson* claim, Appellant points to the following considerations to argue that the State's proffered justifications for striking Juror 89 were mere pretexts for discrimination. First, Appellant notes that as a result of the State's peremptory striking of Jurors 80, 89, and 100, "Appellant's jury . . . was 92% white, despite the fact that nearly a third of Brazos County residents . . . are people of color."[6] Second, Appellant argues that, although the State presented Juror 89's psychology degree and sensitivity to psychological issues as reasons to disfavor her, it did not strike: (a) Juror 11A, a white female, even though Juror 11A had a psychology degree and expressed some interest in psychological issues; or (b) Juror 41, another white female, even though Juror 41 expressed some trepidation in her questionnaire about

---

[6] Juror 80 was a black man, and Juror 100 was a black woman, each of whom the State peremptorily struck. Appellant lodged unsuccessful *Batson* objections to each of these strikes. In this point of error, we do not understand Appellant to challenge the trial court's *Batson* rulings as to Jurors 80 and 100. As we understand Appellant's argument, he offers the fact that the State struck Jurors 80 and 100 as some additional evidence that, when the State struck Juror 89, it was engaging in racial discrimination.

sentencing a mentally ill person to death. Third, Appellant observes that, although the State presented Juror 89's work experience with CPS as a reason to disfavor her, Juror 11A had also worked at CPS, and the State did not strike her. Fourth, Appellant argues that the State engaged in disparate questioning with respect to Jurors 11A, 41, and 89, with Juror 89 receiving the most rigorous scrutiny.

Taking all of Appellant's arguments into careful consideration, we cannot agree that the trial court clearly erred in overruling Appellant's *Batson* objection to the State's peremptory strike against Juror 89. Although Juror 89 shared some similarities with Jurors 11A and 41, the trial court could rationally conclude that neither of those jurors presented the confluence of State-articulated concerns that Juror 89 did. *See Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992) ("[W]hen the State has offered more than one plausible reason for striking a venireperson, it is proper to review these reasons in their entirety in order to assess whether the State's explanation was valid or merely pretextual."). Juror 11A had a psychology degree, exhibited an interest in psychological issues, and worked for CPS, but she did not express the same level of concern that Juror 89 did about sentencing a mentally ill person to death. And while Juror 41 expressed some heightened sensitivity to sentencing a mentally ill person to death, she did not have a degree in psychology and did not work for CPS.

Appellant faults the State for not further exploring the presence or absence of the concerns that it articulated about Juror 89 with Jurors 11A and 41, but voir dire "is a fluid process, often hinging on the interaction of a number of variables and permutations." *Cf. id.* (describing the processes behind "[t]he decision to strike a particular venireperson").

Especially given the jurors' divergent responses on their questionnaires, we cannot say that the trial court clearly erred to attribute any disparate questioning the jurors may have received to something other than racial discrimination.

Finally, we note that immediately before the State exercised a peremptory strike against Juror 89, it declined to strike another Hispanic woman from the panel. And although the empaneled jury was predominantly white, there were at least two other prospective jurors of color, Jurors 90 and 7A, whom the State accepted but Appellant peremptorily struck. The fact that a party may be willing to accept some jurors of color does not, in any given case, immunize that party from a determination that it otherwise exercised peremptory strikes in a racially discriminatory fashion. But, in combination with the other considerations outlined above, we believe that the State's acceptance of these jurors in this case contributes to the reasonableness of the trial court's conclusion that the State did not discriminate against Juror 89 because of her race.

We conclude that the trial court did not clearly err to overrule Appellant's *Batson* objection. The substantive component of Appellant's thirteenth point of error is without merit. Point of error thirteen is overruled.

## VIII. MITIGATION SPECIAL ISSUE

In points of error eleven and twelve, Appellant contends that Article 37.071's definition of mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness" is inconsistent with the Eighth Amendment, both on its face and as applied to Appellant's case. *See* Art. 37.071, § 2(f)(4).

### A. Facial Constitutional Challenge

In point of error eleven, Appellant argues that Article 37.071, Section 2(f)(4) improperly instructs jurors to afford evidence mitigating weight only if it has some "nexus" to the underlying crime. Thus, he contends, it is unconstitutional on its face. We have repeatedly rejected this argument. *See Coble*, 330 S.W.3d at 296; *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *Perry v. State*, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004); *see also Cantu v. State*, 939 S.W.2d 627, 649 (Tex. Crim. App. 1997).

Appellant responds that the Court "has yet to explain how a provision that imposes a substantive limit on what 'counts' as mitigating . . . can survive the sweeping language" the Supreme Court employed in *Tennard v. Dretke* in defining constitutionally relevant mitigating evidence. *See Tennard v. Dretke*, 542 U.S. 274, 284 (2004) ("Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."). He is mistaken. On at least three occasions, we have analyzed—and rejected—this argument with *Tennard* explicitly featured in our reasoning. *See Coble*, 330 S.W.3d at 296 (citing *Tennard*); *Roberts*, 220 S.W.3d at 534 (same); *Perry*, 158 S.W.3d at 449 (same). We see no reason to revisit these holdings. Point of error eleven is overruled.

## B. As Applied Constitutional Challenge

In point of error twelve, Appellant argues that the State's repeated emphasis on Article 37.071's definition of mitigating evidence left the jury with the impression that, for the jury to regard Appellant's punishment phase evidence as relevant mitigating evidence, there needed to be a "nexus" between Appellant's evidence and his commission of the underlying capital murder. In this respect, Appellant asserts, Article

37.071, Section 2(f)(4) was unconstitutional as applied in his case. Appellant points to the facts that: (1) in voir dire, the State "drew prospective jurors' attention to the 'moral blameworthiness' limitation" and used an illustrative hypothetical that "improperly implie[d]" a nexus requirement; (2) during the punishment phase, the State elicited testimony from one of its expert witnesses to the effect that there was no "connection" between Appellant's mental health issues and his commission of the underlying capital murder; and (3) in its closing argument, the State "continued to press the theme that evidence lacking a direct connection to the crime should not count as mitigation."

None of these considerations shows that Article 37.071 itself operated unconstitutionally as to Appellant. The statute itself "does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness." *Perry*, 158 S.W.3d at 449. To the extent Appellant might have argued that, as shown by the considerations outlined above, the State misrepresented controlling Eighth Amendment law or the requirements of Article 37.071, we note only that that is not what Appellant argued. Instead, Appellant argued that Article 37.071, Section 2(f)(4) operated unconstitutionally in his case. And he has failed to explain how exactly the operation of the statute rendered one or more aspects of his trial offensive to the United States Constitution. *Cf. Estes v. State*, 546 S.W.3d 691, 698 (Tex. Crim. App. 2018) (explaining that, in an as-applied constitutional challenge, the challenger bears the burden of producing evidence "specifically demonstrating that the law in question is unconstitutional as applied to him") (internal quotation marks omitted). Point of error twelve is overruled.

## IX.    CATEGORICAL EIGHTH AMENDMENT CLAIMS

In point of error fourteen, Appellant argues that the Eighth Amendment forbids the execution of offenders who, like Appellant, were between the ages of eighteen and twenty-one when they committed their respective offenses.  *Cf. Roper v. Simmons*, 543 U.S. 551, 578–79 (2005) (holding that the Eighth Amendment forbids the execution of those who were under the age of eighteen when they committed their crimes).  In point of error fifteen, Appellant argues that the Eighth Amendment prohibits the execution of offenders who were suffering from "severe mental illness" when they committed capital murder.  *Cf. Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding that the Eighth Amendment forbids the execution of intellectually disabled people).  Taking Appellant's arguments into careful consideration, we remain unpersuaded that a national consensus has formed against the execution of either category of offender.  *See Roper*, 543 U.S. at 574 ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.  It is, we conclude, the age at which the line for death eligibility ought to rest."); *Mays v. State*, 318 S.W.3d 368, 379–80 (Tex. Crim. App. 2010) (rejecting a claim that the Eighth Amendment prohibits the execution of persons suffering from severe mental illness).  Points of error fourteen and fifteen are overruled.

## X.    CONCLUSION

We affirm the trial court's judgment of conviction and sentence.

Delivered: December 8, 2021

Publish